[Civ. No. 3340. Fourth Dist. Aug. 9, 1945.]

AUGUSTA OPP, Appellant, v. FRANK A. FRYE, as Executor, etc., et al., Respondents.

Dempster McKee and Henry T. Moore for Appellant.

Gray, Cary, Ames & Driscoll and John M. Cranston for Respondents.

BARNARD, P. J.—This is an action brought in the name of the widow against the executors of her deceased husband's estate. While in form it is one for an accounting its real purpose is to establish that all or a large part of the property in the hands of the executors is, in fact, the separate property of the widow.

Augusta Opp and Fred Opp were married in 1880, and lived together in complete harmony for about 60 years, until he died on November 15, 1940. Prior to their marriage Mr. Opp was earning $150 a month as a salesman. Mrs. Opp had saved $1,565.59 from teaching school, which she turned over to her husband, in whom she "had supreme confidence." Some two years after their marriage Mr. Opp went into the wholesale tobacco business for himself. Mrs. Opp testified that throughout their married life she attended strictly to the housekeeping and that her husband attended to all business affairs. That they were both successful in their respective spheres abundantly appears. Her husband's original capital, aside from any possible savings from his salary, consisted of the $1,565 he received from his wife and $1,000 which he borrowed from his father, which he later repaid with interest. When he died he left, in addition to a home in San Diego the title to which stood in both their names as joint tenants, personal property which was appraised in the estate at $641,318.64. This consisted entirely of municipal bonds, made payable to bearer, with the exception of about

$6,700 in cash, an automobile appraised at $250 and his interest in the household furniture appraised at $2,500.

Mr. and Mrs. Opp lived in St. Louis, where his business was, until 1913, when they bought the home in San Diego and Mrs. Opp has since resided there. The court found that Mr. Opp continued to reside in St. Louis until 1919. In any event, during these six years, he spent considerable time in St. Louis looking after his business. He sold his interests there in 1919, and thereafter resided in San Diego until his death. In 1920, he opened a bank account in San Diego and sometime subsequently he authorized the bank to honor checks on this account drawn by Mrs. Opp. In 1931, a new joint account with this bank was created, both Mr. and Mrs. Opp signing the usual joint tenancy card. In 1937, Mr. Opp withdrew the balance in this joint account, amounting to $24,132.76, and opened a new account in his own name which was continued until his death. Large amounts were deposited and withdrawn by Mr. Opp from these respective accounts and some checks were drawn by Mrs. Opp on the first two of them. Some of the securities here in question, of the value of $115,000, were traced to withdrawals from the joint tenancy account during its existence.

In 1935, Mrs. Opp inherited from her brother an interest in real property in Kansas City. While this was at all times recognized as Mrs. Opp's separate property, income therefrom to the amount of $3,809.66 was, with her consent, deposited in the husband's bank account and judgment for that amount was given to the plaintiff. No question with respect to that property or the income therefrom is here raised.

Mr. and Mrs. Opp had only one child, a son. To put it charitably, they were greatly disappointed in his inability to understand the value of money. In 1936, Mr. Opp made a will in which he provided that all of the income from the entire estate should go to Mrs. Opp as long as she lived, and that after her death a $50,000 life insurance policy should be purchased for the son and the remainder of the estate should go to the son's four children, a boy and three girls. In connection with that will, Mrs. Opp signed a waiver similar to the one here involved.

Mr. Opp later told his attorney that he had found that his grandson had no more regard for the value of money than his own son had, that he had already given his son a

fortune, that he wanted to treat the son and the grandson alike and provide an annuity for each, and that he wanted to change his will accordingly.

On October 6, 1938, the will here in question was executed. This will gave $2,500 to an old employee, provided he survived the testator, and gave all of his personal effects, his interest in the household furniture and any automobile he might own to his wife. The will then gave "the entire rest, residue and remainder of my estate, of whatsoever kind and character and wheresoever situated, which I may own or in which I may have an interest at the time of my death," in trust to Louis Almgren and Frank A. Frye, who were also named as executors. The trustees were directed to pay all of the net income from the trust estate to Mrs. Opp as long as she lived. It was then provided that upon the death of Mrs. Opp the trustees should purchase certain annuities which would provide an income of $150 per month each to the trustor's son and grandson, so long as they live, and that the remainder of the trust estate should go in certain designated ways to the testator's three granddaughters.

On the same day, Mrs. Opp signed before witnesses a waiver which reads as follows:

"WAIVER OF WIFE TO COMMUNITY AND SEPARATE PROPERTY, RIGHTS, AND ELECTION TO TAKE UNDER WILL.

"I, AUGUSTA OPP, wife of Fred Opp, maker of the foregoing Will dated October 6th, 1938, clearly understanding that my said husband by his said Will disposes not only of all of his separate estate but also all of our community property, in case there is such, including the share thereof which I am entitled to take and receive by law upon his death, as well as his own share or interest therein, being fully convinced in my own mind of the reasonableness and equity of said Will and the wisdom of its provisions, and in consideration of the provisions made for me therein, I hereby elect to and do accept, acquiesce in and consent to said Will and all of its provisions, including disposition at the death of my said husband of all of our community property thereunder, and I hereby waive all claims to my share of any community property, and all and any other claims, rights, interests and estates which I may have at the time of the demise of my said husband upon or in all of his separate

property and all of our community property, including all of his property exempt from execution and my right to a probate homestead, but not including, however, and expressly excepting therefrom my right to a family allowance out of the estate of my said husband during the probate administration thereof, and I hereby accept such of said provisions of said will as apply to or concern me, except as above expressly excepted.''

On October 2, 1939, Mr. Opp executed a codicil to his will, which revoked the $2,500 bequest in favor of the old employee and which otherwise confirmed, ratified and republished the will of October 6, 1938. Mr. Opp told his attorney in this connection that this employee had had a leg amputated and was severely ill and that he wanted to provide for him during his lifetime. It appears that this provision in the original will would have been ineffective, in any event, as this employee predeceased the testator.

On November 7, 1939, Mrs. Opp executed a will in which she left everything that she might own or in which she might have an interest to her husband should he survive her. This will then referred to the trust provision of her husband's will of October 6, 1938, and provided that in the event her husband predeceased her all of the property which she owned or in which she had any interest should be added to and become a part ''of the residuary trust estate created for the benefit of my said granddaughters by Article Five of my husband's said will'' and that ''I purposely make no bequest to my said son Harold B. Opp or to my grandson Fred Opp, Jr., since adequate provision has been made for them in my husband's will.''

After the death of Mr. Opp an action, similar in purpose to the present action, was brought in the name of Mrs. Opp as plaintiff. Mrs. Opp's testimony at the trial of that action was read in evidence at the trial of this action. She then testified that she did not start that action; that she had had nothing to do with it; that she did not read the complaint therein and had no recollection of signing it; that ''I was not the plaintiff that did that''; that she had never talked with anyone about bringing or filing that action; that ''I haven't been suing anybody''; and that she had not retained any lawyers to bring suit against the executors of her husband's will. She further testified that she did not contend

that her husband had taken any unfair advantage of her in connection with the disposition of his estate and that it was not her desire to change any of the plans her husband had for the disposition of his estate on his death, and that "Whatever he did was right." That action was dismissed and a few days later the present action was brought. It not only appears that the former action was brought without the knowledge of Mrs. Opp and contrary to her desires, but it also rather clearly appears that the moving spirit in bringing that action was the son of Mr. and Mrs. Opp. Circumstances which here appear justify the inference that he is the real plaintiff in this action.

Briefly stated, the complaint herein alleged that shortly after their marriage the plaintiff turned over an unknown amount of money to her husband to manage for her; that the bank account maintained from 1920 to 1931, with all securities purchased therefrom was the property of herself and her husband as tenants in common; that the securities purchased from the joint tenancy account, opened in 1931, remained as joint tenancy property; that in 1937, her husband closed this account and opened one in his own name without her knowledge; and that her husband had received and deposited in these accounts certain income from property she inherited from her brother. The prayer was for an accounting and for judgment for all amounts found due. The answer raised an issue as to all these matters and pleaded the waiver and election to take under the will above referred to; that plaintiff had accepted partial distribution under the will and was estopped to maintain the action; and that the action was barred by laches.

The court found that the money turned over to the husband after the marriage was given to him by the plaintiff as a gift; that during the marriage the plaintiff had no separate property other than that which she inherited from her brother; that Mr. Opp had received $3,809.66 in income therefrom for which he had not accounted; that while Mr. Opp authorized the plaintiff to draw checks on the bank account opened in 1920 that account was never owned by the parties as tenants in common; that a joint tenancy account was opened in 1931 and that seven items of the securities listed in the inventory came from that source; that in 1937, with the knowledge of the plaintiff, Mr. Opp withdrew the

balance in this joint account and opened a new account therewith in his own name; and that he was entitled to dispose of all of the personal property listed in the inventory, and that all this property is a part of his estate with the exception of the $3,809.66. The court then found that the waiver above referred to was executed contemporaneously with the execution of the will and was attached thereto; that this waiver was not procured by undue influence or fraud; that the plaintiff received sufficient consideration therefor; that Mr. Opp took no advantage of the plaintiff in that connection and used no adverse pressure of any kind; that he made no misrepresentations and there was no concealment; that the plaintiff was fully advised of the nature and effect of this waiver and executed the same freely and voluntarily; that the same is in all respects valid and binding; that the plaintiff has accepted certain articles through a partial distribution under the will; that by reason of the foregoing the plaintiff has elected to take under the terms of the will and is estopped to assert any other claim to any of the property in question other than the said sum of $3,809.66; and that the plaintiff at no time prior to the death of Fred Opp repudiated or attempted to rescind this waiver or indicated any dissatisfaction with the terms of the will or with the terms and conditions of the waiver. Judgment was entered awarding the plaintiff $3,809.66 and this appeal followed.

Appellant's contention, that the money turned over to Mr. Opp by Mrs. Opp shortly after their marriage constituted a loan, or at least a trust for which Mr. Opp was expected to and bound to account, may be first considered. Mrs. Opp at no time testified that she lent the money to her husband, or that she gave it to him to hold for her or to invest for her, or that she expected him to account for it. At the first trial, when asked whether, after their marriage, she had turned over to her husband what money she had she replied: "Yes, I felt he was a capable business man, and could best take care of my funds so I gave it all to him." And when further asked for what purpose she had turned the money over to her husband she replied that she "felt he could do more with it, than I could or the bank." At the trial of this action Mrs. Opp, who was then between 85 and 90 years of age, was questioned at her home. Because of her condition, the doctor had ordered that only one person

ask her questions and, by stipulation, this was left to the judge. Very few questions were asked. She then testified that after her marriage she had turned over the money she had to her husband, that he handled her affairs, that she had supreme confidence in him, and that he was honest and would not take anything belonging to another. She was then twice asked whether, when she gave this money to her husband, she did it as a loan or whether she expected him to return it, and she replied: "I never thought of it again." After a few questions about the property in Kansas City which she inherited from her brother, and which are not material here, the court asked her whether she "intended to establish a trust when you gave your savings to your husband." She replied: "No."

Two witnesses testified that in late years Mr. Opp had told them that he used the money he got from his wife in starting a business of his own. Another witness testified that in 1938 Mr. Opp told her "Mrs. Opp had about $7,000 and I took it and invested it and that is where we got our start in the first place. You know great trees from little acorns grow." The amount saved by the plaintiff and turned over by her to her husband was conclusively fixed at $1,565.59. Assuming that a part of the testimony, and possible inferences therefrom, would support a contrary finding the court's finding in this regard is amply supported by the evidence.

 There is no merit in the contention that one of the findings, that funds deposited in the bank account opened in 1920 were not owned by these parties as tenants in common, is not supported by the evidence. While Mrs. Opp's name appears on the signature card that card contained no statement that she was a coowner of the account and it sufficiently appears that her signature was placed there sometime after the account was opened. A notation on the back of the card refers to Mr. Opp only. Moreover, the first three of the bank's ledger sheets in this account, covering a period of more than a year, contained only the name of Mr. Opp except that on the first one Mrs. Opp's name had been written in with a pen or pencil. A number of subsequent sheets contained only the name of Mr. Opp. There is no evidence that Mrs. Opp ever deposited any funds in this account and the evidence justifies the inference that all deposits therein were made either from Mr. Opp's separate

property or from their community property. The court's finding is sufficiently supported. (*Denigan* v. *Hibernia etc. Society,* 127 Cal. 137 [59 P. 389].)

Appellant's main contentions are that certain of these securities were purchased with funds taken from the joint tenancy account and that property so acquired remains joint tenancy property (See *Estate of Harris,* 169 Cal. 725 [147 P. 967]; *Estate of Harris,* 9 Cal.2d 649 [72 P.2d 873]); that the waiver signed by Mrs. Opp attached to the will is invalid; and that, in any event, it was not intended to cover Mrs. Opp's joint tenancy interest in some of these securities.

■ The rule announced in the Harris cases is that personal property acquired with joint tenancy funds retains the character of joint property "unless by some agreement between the parties its character was changed." None of the cases hold that such an agreement must be in writing and it is well settled that an agreement affecting such rights may be oral, and that the intention of the parties with respect thereto may be shown by circumstantial, as well as by direct, evidence and by inferences reasonably to be drawn therefrom. (*Estate of Sehabiague,* 47 Cal.App.2d 793 [119 P.2d 30]; *Williamson* v. *Kinney,* 52 Cal.App.2d 98 [125 P.2d 920].

■ Aside from some other evidence we think this will and waiver are sufficient evidence of such an agreement, and of the intention of the parties to change the character of any joint tenancy property here in question so as to permit the same to be disposed of by the will.

No attempt was made in the will to dispose of the Opp's home in San Diego. They knew and recognized, and Mrs. Opp was told before she signed the waiver, that this property, being held in joint tenancy, would go to her outside of the will. After the bequest to the old employee and one giving the household furniture and the automobile to Mrs. Opp, the will gives "the entire rest, residue and remainder of my estate of whatsoever kind or character and wheresoever situated, which I may own or in which I may have any interest at the time of my death," to the trustees on certain trust conditions. The title of the waiver not only includes all the separate property rights of the wife but the body thereof includes the statement that she clearly understands that the will disposes of all of the husband's separate estate, all of their community property and also "including the share thereof which I am entitled to take and receive by law

upon his death." There is then the statement that she accepts all of the provisions of the will which apply to or concern her, with the sole exception that she reserves the right to a family allowance.

All, or nearly all, of the property here in question was originally the community property of these parties or would have been had they resided in this state at all times. To them, it was property they had accumulated together. If, as the appellant contends, nearly all of this property was actually the separate property of the wife, if it were so considered by the wife, and if the husband was merely attempting to dispose of the remainder, the trust created by the will would have been entirely insufficient to provide for the purposes sought to be accomplished, and the making of the main provisions of the will would have been an idle act. The language used in the will and the waiver, and the facts surrounding their execution, fully support the inference and justify the conclusion that the parties no longer intended to be governed by any legal relationship arising from any joint tenancy status with respect to this personal property, and that they were dealing with and treating all of the property which they had accumulated during their married life as a whole, aside from the home property, and as being the estate of the husband. It appears that the attorney who prepared the will did not know that any of this personal property had ever been held in joint tenancy, and it clearly appears that neither Mr. nor Mrs. Opp were relying or acting on such a fact.

The facts here are essentially like those in *Security-First Nat. Bank*. v. *Stack*, 32 Cal.App.2d 586 [90 P. 337], and similar principles should be applied. In that case the court said:

"The term 'estate' is comprehensive, and as has been hitherto declared, 'One of the most common uses in which the word "estate" is used is to denote and describe in a most general manner the property composing the assets of a deceased,' and, 'During the lifetime of the husband, he is the owner and entitled to the possession of all the community property.' (*Estate of Sayre*, 114 Cal.App. 649 [300 P. 833].) It is likewise evident as heretofore noted in effect that upon the death of the husband the property purchased with funds from the joint bank account, by agreement of the parties, became and was a part of the 'entire community estate'

referred to in the will, and hence 'property disposed of by said Will' as provided in the election and waiver. Any other construction would in effect extend legal sanction to the unwarranted repudiation of a valid contract, and would as well defeat the obvious intent of the testator.''

In *In re Stewart*, 74 Cal. 98 [15 P. 445], the court said: ''Every clause in the will bears a clear and indisputable badge of that intention. He dealt with the property just as he had been accustomed to deal with it through a long, active, and successful business life; just as he had in accumulating and disposing of the property during his lifetime,—without consulting his wife, or asking her to join with him in any conveyance. He uses the phrase 'my estate' in the sense that he had been accustomed to use it all of his life.''

The trial court has construed the will and waiver as an agreement, and as indicating an intention, that these bearer bonds, which were purchased with joint tenancy funds, should constitute a part of the estate covered by the will and this interpretation is a reasonable one even though it be conceded that another is possible. It sufficiently appears that these parties intended the will and waiver to cover and dispose of all of this personal property which they had accumulated together, and that they referred to the estate of the husband in this sense.

The appellant contends that the fact that Mrs. Opp was told that their home, being held in joint tenancy, was not covered by the will, and the fact that joint tenancy property was not otherwise mentioned, conclusively proves that there was no intention to change the status of any personal property held in joint tenancy. This creates no more than a conflict and the other evidence is sufficient to support the court's interpretation and conclusion. If the parties had any ideas in this connection they may have thought, as was then generally understood, that a joint tenancy in real property could not be changed except by deed. The fact that they did not mention any joint tenancy property other than the home is, under the circumstances, more consistent with the idea that they then had no intention of treating any of the personal property as being in joint tenancy, than with the idea that they did not intend the will to affect this large part of their accumulations. In any event, the evidence, as a whole, supports the inference that these parties intended to deal

with all of this personal property as a unit and irrespective of its kind or character.

There is also other evidence supporting the court's conclusions in this regard. Mrs. Opp had signed a similar waiver two years before and the matter was one which she had ample time to consider. A year after this waiver was signed she quite effectively ratified and confirmed this disposition of the property, and disclosed her own intentions in this regard, by the provisions of her own will. Moreover, she testified at the first trial that she had never claimed any interest in these securities which Mr. Opp purchased. She further testified that it was not her desire to change any of the plans her husband had for the disposition of his estate, that she did not contend that her husband had taken any unfair advantage of her in this regard, and that ''He couldn't do that. He wouldn't do that.'' When asked if her husband had ever abused the confidence she had in him, she replied: ''Oh no, no, no.'' After repeatedly denying that she had any part in this litigation she exclaimed: ''Oh, I am getting so tired, Mr. McKee, of this drama, I wish it were in Halifax.'' Even after the first action was brought, when she was presumably advised of her possible rights by counsel supposed to be representing her, she still asserted that she had not been imposed upon, and that she was satisfied with and had no desire to change her husband's disposition of the estate. At no time did she testify that she intended anything to the contrary when she signed the waiver.

It is further contended that this waiver must be held invalid because of various presumptions of undue influence arising from the marriage relation, inadequacy of the consideration, failure to disclose all of the facts and the absence of independent advice. It is argued that this case closely parallels the case of *Gaines* v. *California Trust Co.*, 48 Cal. App.2d. 709 [121 P.2d 28]. In that case a judgment sustaining a waiver was reversed because the judge had assumed that the property was separate property when he was required to assume that it was community property, and because there was no evidence to overcome a presumption of undue influence.

In addition to the information given her when she signed the former waiver, it appears that Mrs. Opp was thoroughly informed of the provisions of this will and the waiver before

she signed the latter, that her husband took no part in this, and that she apparently understood completely what was being done and expressed herself as in agreement therewith. The attorney who drew the will testified that he considered he was acting as attorney for both Mr. and Mrs. Opp, and that he prepared the will and gave it to Mr. Opp some two weeks in advance; that he went to their home and sat down at a table with Mrs. Opp while his partner and Mr. Opp were looking at art objects; that he went over the will with Mrs. Opp paragraph by paragraph; that when he explained the trust provision providing for an annuity of $150 a month to the son and grandson Mrs. Opp stated she understood it and that she considered it for the best; that he read the waiver word for word, including the title, explaining it as he read it; that he told her that the law was uncertain and that it would be difficult in this case, because of the manner in which the property had been acquired, to determine what part was separate property and what part community property, but that whatever it was the waiver covered the entire estate; that he told her that if she signed the waiver she would receive the income from the entire estate while she lived, and that after her death annuities would be purchased for her son and grandson and the rest of the estate would go to the three granddaughters; that he told her that this "would be a waiver of all her interest in the estate, whether it was separate property or whatever kind of property it was" and that "if she signed this, it covered the entire estate, both Mr. Opp's interest in it and any interest which she might have in it," except for the home and the right to a family allowance; that he then asked her if she understood this and if it met with her approval and she replied in the affirmative; and that Mr. Opp then executed the will and Mrs. Opp then signed the waiver, which was witnessed by the same persons.

Not only does it appear that Mrs. Opp signed this waiver voluntarily and with the intention to accept the provisions of the will as covering all of the property owned by herself and her husband, with the exception of the home and that which she had inherited from her brother, but the testimony of Mrs. Opp herself rather completely dispels any presumption of undue influence which could have existed. Any possible conflict which may be said to arise from isolated portions of the evidence has been resolved by the trial court

and the evidence is entirely sufficient to support the findings in this regard.

█ Some contention is made that the execution of a codicil by Mr. Opp in 1939 released the waiver. In *Estate of Johnston,* 197 Cal. 28 [239 P. 397], which is relied on, a bequest which was the sole consideration for the execution of the waiver was changed by a codicil. A quite different situation here appears. As a matter of fact, the codicil here had no actual effect as the old employee, who had been given $2,500 in the event he survived the testator, died before Mr. Opp's death. Moreover, the waiver declares that the consideration for its execution is "the provisions made for me therein" and it clearly appears that an additional consideration was Mrs. Opp's desire to protect her son and grandson to the extent of assuring them something to live on, and to provide for her granddaughters through the trust. Mr. Opp had already taken care of this old employee in his lifetime, there is no failure of consideration, and no such alteration appears as would upset and release the waiver.

It is unnecessary to discuss a further point relied upon by the respondents. The material findings are not only supported by the evidence but it would be peculiarly inequitable to reverse this judgment under the circumstances which appear to justify the inference that the only advantage taken of this aged and infirm lady is being taken by others and was not taken by her husband.

The judgment is affirmed.

Marks, J., concurred.

Appellant's petition for a hearing by the Supreme Court was denied October 4, 1945.