[Civ. No. 7662.   Third Dist.   Oct. 28, 1949.]

GOLDSMITH FRYMIRE, Respondent, v. LEONARD W. BROWN et al., Appellants.

Everett H. Roan for Appellants.

Nichols, Richard, Allard & Williams and H. G. Crawford for Respondent.

ADAMS, P. J.—This is an appeal by Leonard W. Brown and Upper Lake Union High School District from a judgment in favor of plaintiff Frymire in three separate actions filed by him, and on the issues raised by the school district in a complaint in intervention which it filed, all of which were by stipulation consolidated for trial and tried together, but one set of findings and one judgment having been filed.

Plaintiff's actions were brought to recover from Brown four separate parcels of property in Lake County and for an accounting for certain personal property and moneys. The school district, in a complaint in intervention, claimed title to some of the parcels of real estate, which had been conveyed to it by Brown after the death of Mrs. Frymire.

The four parcels of real property were claimed by plaintiff, the surviving husband of Celia H. Frymire, deceased, as community property of the spouses, and are referred to as the Elmer Dewell Tract of about 10 acres, deeded to Mrs. Frymire on November 10, 1930, the John Dewell Tract of about 10 acres deeded to Mrs. Frymire on December 2, 1930, the "Town House," consisting of a dwelling and about one acre of ground at Upper Lake which had been distributed to Mrs. Frymire by the decree of distribution in her father's estate about September 7, 1945, and the Carter parcel of about 9 acres conveyed to Brown on October 23, 1942.

The evidence in the case shows that the Frymires were married March 15, 1923, and continued to be husband and wife until Mrs. Frymire's death April 1, 1947. At the time of their marriage neither had any substantial sum of money but both were employed. Their earnings were thereafter commingled and applied to their common support and acquisitions. Out of such community funds they purchased the two Dewell parcels of land. The so-called town house was devised to Mrs. Frymire by her father in execution of an agreement that it should go to Mr. and Mrs. Frymire in payment for services rendered by Mrs. Frymire to her father in caring for him during the last eight years of his life.

For some years after their marriage the Frymires lived in Westwood, Lassen County, where both were employed, he as a storekeeper and she as a graduate nurse. In February, 1930, Mr. Frymire went to work in Pittsburg, Contra Costa County, where he worked continuously until he reached retirement age in 1947. When the parties left Westwood Mrs. Frymire's father, who was old and ailing, asked his daughter to come to Upper Lake to take care of him in his home there, which she did, it being agreed that for her services she should have said home on her father's death.

The spouses continued to see one another and continued their relationship as husband and wife, and after the death of Mrs. Frymire's father the Frymires bought a home in Pittsburg, where they resided for a time. For convenience they maintained a bank account in Pittsburg called the house ac-

count, upon which Mrs. Frymire alone drew checks, Mr. Frymire maintaining another account in his own name. Mr. Frymire, out of his earnings and from sale of some bonds, kept the house account supplied, and therefrom his wife paid insurance premiums for both of them. Also, Mr. Frymire paid large doctor's bills for his wife, as she was in poor health.

Before leaving Westwood they had discussed the purchase of the Dewell tracts, which belonged to two of Mrs. Frymire's uncles, and some adjoining land for a home for them when Mr. Frymire retired. They did not have sufficient money for these purchases, so $1,700 was borrowed from Mrs. Frymire's sister and brother-in-law. This loan was ultimately paid off by 1940 as Mr. Frymire turned into their common pool his earnings and the proceeds of bonds owned by him before his marriage, while Mrs. Frymire put in a service bonus received by her because of her services as an overseas nurse in World War I, the proceeds of her matured life insurance policy, and some of her earnings as a nurse. While the Dewell tracts were deeded to Mrs. Frymire alone, she always referred to them as "our property," and plans were drawn by her for a home for her and her husband which was to be built thereon, it being planned that the Pittsburg home and the town house should be sold.

From sometime in 1941 to the date of Mrs. Frymire's death in April, 1947, defendant Brown was employed to farm the lands in Lake County belonging to the Frymires, and while the latter maintained the home in Pittsburg, the supervision of the property in Lake County was left to Mrs. Frymire who made frequent trips there and improved the buildings thereon with community money. During the years that Brown was employed on the property he became the trusted agent of the Frymires and gradually took over the entire management and control of the properties, harvesting and selling the crops and keeping under his control the proceeds therefrom. Mrs. Frymire's health gradually declined, and on March 24, 1947, when her death seemed imminent, she signed three deeds purporting to convey to Brown the two Dewell tracts and the property which she had received from her father. She died in the Lake County home but one week later, whereupon Brown, without notifying Mr. Frymire of his wife's death, shipped her body to an undertaker in Ukiah who notified Mr. Frymire of her death. Brown also withdrew from the joint account the balance of $5,738.19 and redeposited it in his own name, without advising Mr. Frymire.

Regarding the Carter property the evidence shows that Brown acquired title to it on October 23, 1942, but he admitted that he paid for same with moneys advanced by Mrs. Frymire which he drew from the joint account maintained in his name and that of Mrs. Frymire to facilitate farming operations, and which had been opened with community funds belonging to Mr. and Mrs. Frymire and in which Mrs. Frymire had deposited money from an account she had in the Crocker National Bank in San Francisco. Brown admitted that this property was bought with Mrs. Frymire's money and that he did not earn any part of the $1,600 paid for it.

Mr. Frymire testified that he and Mrs. Frymire had, in January and February, 1942, talked about buying the Carter tract which adjoined the Dewell tracts; that he had questioned their financial ability to buy it, but Mrs. Frymire had urged that they had almost enough money in the bank; and that later that year, when he was visiting with her at Upper Lake, he told her to go ahead and buy it.

In respect to the three deeds conveying the Dewell tracts and the town house to Brown, the latter testified that about 10 days before her death Mrs. Frymire asked him to have a Mr. Glassgow (a notary public) and Doctor Beil, her physician, and one Jack Dodge come to her house as she wanted to fix up her business and wanted them to witness some deeds. The day after the deeds were executed they were recorded by Dodge who instructed the recorder to mail them to Mrs. Frymire, which was done. But she died before they reached her, and they were turned over to Mr. Frymire. They were never in Brown's possession, and he admitted that he had never seen them until they were produced at the trial. It is undisputed that he gave no consideration whatever for any of them.

The trial court found in favor of plaintiff on all issues and by its judgment declared void the three deeds executed by Mrs. Frymire to Brown, decreed that plaintiff was the owner of all four of the parcels of real property, and ordered their conveyance to him. It also decreed that Mr. Frymire was the owner and entitled to the possession of an automobile, a Ford truck, tools, farming equipment and machinery, which were on the Dewell tracts, and a balance of $2,502.17 on deposit in the Bank of Upper Lake, and that he have judgment against Brown for the additional sum of $936.02. This judgment was based upon its findings that the properties involved were community property of plaintiff and his deceased wife.

■ On this appeal Brown's first contention is that the court erred in finding that the property was community property. However, we are satisfied that the record reveals ample evidence to sustain this finding. It shows that the Frymires were husband and wife during all of the time that the properties were being acquired, and that their joint earnings were the source of the funds with which the Dewell and Carter properties were purchased; that the purchases were made for the purpose of making a home for them in their old age, and were always referred to by Mrs. Frymire as "our property," and that she never referred to them or claimed them as her separate property. The evidence also supports the conclusion that the property which Mrs. Frymire received from her father's estate was left to her in payment for services rendered by her in caring for her father during his last eight years, and pursuant to the agreement made by her father that she should be so paid. This property, then, represented the earnings of Mrs. Frymire during the marriage, and was properly considered as community property. Mr. and Mrs. Frymire filed joint income tax returns in which they reported all income as community income. The marriage of the spouses was apparently a happy one, and while they did not, at all times, live in the same household, they visited one another, and to the very last maintained the relationship of husband and wife, their failure to live together at all times being due to the necessities of their respective obligations which required that, for their common good, Mr. Frymire remain in Pittsburg where he was employed, and that Mrs. Frymire spend her time on the property which had been acquired for their future home; and also because her health was not good, and Lake County was better for her than Pittsburg.

■ While the Dewell tracts and the former home of Mrs. Frymire's father stood in her name alone, it is well established that such a fact is not conclusive as to whether or not property is the separate property of the holder of the legal title, or is community property; that the separate property of either or both spouses may be transmuted into community property without the necessity of any written agreement; and that the intention of the parties that property held in the name of the one or the other is to be considered as community property, may be shown by circumstantial as well as direct evidence. (*Estate of Sill*, 121 Cal.App. 202, 204 [9 P.2d 243]; *William-*

*son* v. *Kinney,* 52 Cal.App.2d 98, 102 [125 P.2d 920]; *Opp* v. *Frye,* 70 Cal.App.2d 478, 486 [161 P.2d 235].)

As for the finding that the Carter property was community property, Brown admitted that he did not pay for it with his own money, and that Mrs. Frymire deposited in their joint farming account the moneys with which it was purchased. He also admitted that he did not earn any part of the moneys paid for it. Mr. Frymire testified that he and his wife had conferred regarding acquisition of this parcel (which adjoined the Dewell property) when he was on a visit to her at Upper Lake, and they finally agreed that she should buy it and allow a debt which they owed to her father's estate to "ride" longer. Brown having admitted that he bought this property with Mrs. Frymire's money, became, perforce, her trustee of same (*Kinert* v. *Wright,* 81 Cal.App.2d 919, 924 [185 P.2d 364]; Civ. Code, § 853) and cannot claim ownership in himself.

Regarding the three deeds which Mrs. Frymire executed just prior to her death, the trial court found that during the five and one-half years that Brown was employed to farm the lands in controversy, he became and was the trusted agent and servant of Mr. and Mrs. Frymire; that he gradually took over the entire management and control of the properties, harvesting and selling the crops and keeping under his control the proceeds therefrom; that as Mrs. Frymire's health declined she became weak in mind and body, and Brown frequently administered to her needs at Upper Lake; that he knew, at the time the deeds were signed, that her death was imminent; that because of his status as trusted agent of the Frymires and the admitted fact that he gave no consideration whatsoever for the lands described in the deeds, a presumption of fraud and undue influence arose; that Brown failed to rebut this presumption, and that to defraud Mr. Frymire of his right, title and interest, and his right of inheritance, he procured and induced Mrs. Frymire to sign the three deeds; that the deeds were never delivered to Brown; and that Mrs. Frymire acted without independent advice of any kind, and but for Brown's influence would not have signed the deeds. It was also found that Brown kept no books of account, or accounts of his receipts or disbursements, commingled all of the receipts from sale of crops with other funds held and used by him, in such manner that it was impossible to trace them.

While Brown testified that Mrs. Frymire asked him to have a notary, and her doctor, Beil, and Jack Dodge come

to her home and witness some deeds, and there is no direct evidence that he did so, the inference is that he did. Brown failed to call any of these parties to testify in his behalf, and the presumption arose that had he called them they would have given testimony unfavorable to him. (Code Civ. Proc., § 1963(5).)

Brown testified that there was an agreement between him and Mrs. Frymire that the profits of the farming operations were to be divided between them equally, and that they, therefore, became partners. But his manner of handling the affairs contradicts such a contention, and the trial court's finding to the contrary is fully sustained by the evidence. Even a partnership between them would not have justified his assumption of ownership of all of the property upon her death. Furthermore, no partnership income was ever reported by Brown or claimed to Mr. Hildebrand who made out his income tax returns for the years 1942-1947, inclusive. Appellant admitted that with money from the joint bank account he bought livestock which he later sold, and once bought a piece of real property for which he paid $900 out of the joint funds, and that he later sold it for $1,600, but did not return either the $900 taken out or the profit to such bank account, or account to Mrs. Frymire for same. Such conduct negatives any claim of a partnership relation between the parties. He also admitted that he had paid his living expenses, dentist's bills, lodge dues, etc., from the joint account.

It is further argued by appellant that the trial court erroneously ruled that defendant would be bound by the testimony of plaintiff if said plaintiff were called by defendant under section 2055 of the Code of Civil Procedure. The record shows that at the conclusion of the direct examination of plaintiff on his testimony on his own behalf, there was a colloquy between the court and one of the defendant's attorneys regarding the extent to which plaintiff could then be cross-examined and defendant's rights, were the witness called as an adverse witness, during which defendant's counsel apparently took the position that his client would not be bound by testimony which was elicited from plaintiff called under section 2055. The court disagreed with this contention, stating that a party has a right to rebut or impeach the testimony of a witness called under that section, but that his testimony was binding upon the party as any other testimony in the case. The court then advised said counsel to proceed in the orderly way, and

cross-examine plaintiff, saying that the court would follow the usual procedure; and that at the close of testimony for plaintiff defendant might call said witness under section 2055, if he so desired.

Defendant's counsel then cross-examined plaintiff exhaustively and at length. Subsequently said counsel stated that he did not care to call Mr. Frymire as an adverse witness. We think that appellant, in construing the words of section 2055, that "The party calling such adverse witness shall not be bound by his testimony, and the testimony given by such witness may be rebutted by the party calling him for such examination by other evidence," as meaning that should such witness give testimony unfavorable to the party calling him, the trier of the facts, whether judge or jury, could not consider such testimony, was in error. We do not so construe it. The section itself explains its meaning when it provides that the party calling such witness may rebut such testimony; but it does not provide that the testimony so given is not to be considered as testimony in the case. In *Balasco* v. *Chick*, 84 Cal. App.2d 802, 808 [192 P.2d 76] (hearing in Supreme Court denied), the court said: "Undoubtedly, it is true that any party to a lawsuit may call an adverse witness without being bound by the testimony of that witness, but '[t]his testimony is, of course, evidence in the case and may be considered in determining the issues of the case upon the trial or final hearing by the court, or if the case is before a jury, by the jury.' (*Smellie* v. *Southern Pacific Co.*, 212 Cal. 540, 559 [299 P. 529].) The jury in the instant case was therefore justified in considering the evidence of the defendant called under section 2055 of the Code of Civil Procedure, as merely creating a conflict with testimony in contradiction thereof, to pass upon the weight of such evidence, and if believed by them, to predicate a verdict thereon." Also see *Joseph* v. *Vogt*, 35 Cal.App.2d 439, 441 [95 P.2d 947], and cases there cited.

We find no reversible error, therefore the judgment is affirmed.

Peek, J., and Thompson, J., concurred.

Appellants' petition for a hearing by the Supreme Court was denied December 22, 1949.