**In the Matter of John COLLINS, doing business as Stan's Stage Coach Stop, Bankrupt.**
**No. 67977.**

United States District Court
S. D. California, Central Division.
May 18, 1956.

Craig, Weller & Laughran, by Thomas S. Tobin, Los Angeles, Cal., for the petitioning creditors.

Grainger, Carver & Grainger, by Adele O. Carver, Los Angeles, Cal., for the bankrupt.

YANKWICH, Chief Judge.

On September 6, 1955, the amended involuntary petition was filed by certain creditors asking that John Collins doing business as Stan's Stage Coach Stop, be adjudged a bankrupt because while insolvent on or about August 4, 1955, he made or suffered a fraudulent transfer of his property under the provisions of Section 67, 11 U.S.C.A. § 107, and Section 70, 11 U.S.C.A. § 110, of the Bankruptcy Act. The alleged act of bankruptcy of which the Referee found the

debtor guilty is stated in the Amended Complaint in this manner:

"That on or about August 4, 1955, and at which time the bankrupt was insolvent, the bankrupt caused a transfer of a certain on sale general distilled spirits license to one Fred De Carlo without a fair consideration or without any consideration therefor, and which thereby rendered him insolvent, which said on sale liquor license was and is of a reasonable and current market value of between $4500.00 and $5000.00; that said bankrupt completed the said transfer in so far as any act required of him to do in order to effectuate said transfer, in that on August 4, 1955, and within four months preceding the filing of the petition herein, the bankrupt filed with the California Department of Alcoholic Beverage Control an application for transfer of license duly executed by him and acknowledged before a Notary Public, whereby he transferred said liquor license to the said Fred De Carlo; that said transfer was thereby so far completed that neither the bankrupt nor a bona fide purchaser from him could obtain greater rights in said liquor license than the said Fred De Carlo."

The Referee found these to be true. [Findings III and IV]

The facts other than insolvency need not detain us. For the entire dispute on review centers on the finding of insolvency which is challenged as unsupported by the evidence.

After hearing the matter on review, it was remanded by the undersigned to the Referee on February 27, 1956, with direction to hear the testimony of the wife of the bankrupt and such additional testimony as may be offered as to the circumstances in which the real property, the family home, now standing in the name of the wife was placed in her name.

The Referee heard the additional testimony and made his return which, in

effect, states that he does not believe the testimony given by John Collins as to the circumstances in which the title to the home was taken in the name of the wife and that his position is not changed from that originally taken, because he is of the view that

> "the testimony of both the bankrupt and his wife to be *entirely self-serving* and *unworthy of belief* by this court."

■ The entire question of solvency turns upon the proposition whether the home occupied by the bankrupt and his family at Whittier, California, was the wife's separate property or not. The findings of the Referee, of course, must be accepted "unless clearly erroneous". Federal Rules of Civil Procedure, Rule 52(a), 28 U.S.C.A.; General Order #47, 11 U.S.C.A. following section 53. However, if there is no substantial evidence to support it, a finding will not be sustained. In re Leichter, 3 Cir., 1952, 197 F.2d 955, 957.

The facts relating to the acquisition of the home are these: On December 7, 1951, the bankrupt's wife, Ada J. Collins, entered into an escrow agreement for the purchase of a residence in Whittier for the sum of $13,100; $5,154.00 in cash was to be paid into escrow. The title was to be vested in Ada J. Collins, *a married woman*. The testimony of the wife shows that she and her husband had recently arrived in California from the East, that they had been married since 1938, that she did not have money at the time of her marriage and earned none after. She opened the escrow and, as she stated:

> "It was a matter of convenience so that I could take care of things so that he could go back East to get the money."

Her husband went East to "get the money" because "they would not take a personal check on an out-of-town bank." She does *not* claim to own the property now, nor has she ever claimed to own it as her *separate* property. On the contrary, she states:

> "We own it together. We don't own anything that way. What belongs to one belongs to the other. We just don't live that way."

The escrow and the deed both designate Mrs. Collins as "*a married woman*". The words usually put in when it is intended that property be in the name of the wife *as her separate* property are absent. The escrow clerk who testified at the hearings before the Referee, Temperance Bailey, stated that, while she did not recall the conversation had with the Collins', it was general practice when the property is taken in the name of one of the spouses as *separate property*, to insert such a clause and that when this is done, a quitclaim deed by the other spouse is required. Her testimony reads:

> "Q. When you request a policy of title insurance in that kind of a situation—where the title is to be vested in a married woman as separate property, do you transmit to the title company any papers in addition to the deed? A. The deed would contain a clause that it was to be—was deeded to the one, the grantee, the property to be the separate property; but there would be an agreement on the deed, signed by husband and wife that it was to be the separate property of the grantee.
>
> "Q. In other words, your custom, then, would be that the husband would sign on the deed itself? A. Yes; either that or a quitclaim deed, in a separate instrument.
>
> "Q. The husband would execute a quitclaim deed? A. It would be embodied in the instructions.
>
> "The Referee: Now, we have the instrument here, as petitioning creditors' exhibit No. 8; and the court finds nothing with respect to the vesting of the title. You say it would be right on this instrument? A. Yes."

■■ The creditors' involuntary petition is *not* directed to the wife. Her testimony stands unimpeached. The facts testified to by the escrow clerk cor-

roborate the wife's statement that this was to be their joint home, was bought from their savings during their married life and that *it was not the intention to vest the title in her as her separate property.*

The Civil Code of California provides: " * * * whenever any real or personal property, or any interest therein or encumbrance thereon, is acquired by a married woman by an instrument in writing, the presumption is that the same is her separate property, * * *." California Civil Code, § 164.

The presumption is rebuttable. Wilson v. Superior Court, 1951, 101 Cal.App.2d 592, 595, 225 P.2d 1002. At all times, the intention of the parties at the time governs. And what the courts consider sufficient in one case to prove that the property was community property may not be so considered in others. The California Reports are full of cases on the subject. Illustrative of the view which requires *strong* proof to overcome the presumption of the deed is Kimbro v. Kimbro, 1926, 199 Cal. 344, 249 P. 180. At the other end are cases in which the property was held to be community property notwithstanding the fact that it was bought with the *separate* earnings of one of the spouses. In re Estate of Piatt, 1947, 81 Cal.App.2d 348, 350–351, 183 P.2d 919; Frymire v. Brown, 1949, 94 Cal.App.2d 334, 339–340, 210 P.2d 707; Geller v. Geller, 1953, 115 Cal.App. 2d 822, 825, 253 P.2d 52.

■ In all cases of this character, in determining the intention of the parties, the fact that the parties had been married for a long time, that the property was purchased with community funds, and was intended "as home" has great weight. In re Carlin, 1912, 19 Cal.App. 168, 124 P. 868. In the case before us, there is no evidence that at the time of arrival at Whittier in 1951, the husband intended to go into any particular business or that the manner of taking title to be the property was thought of as a

means of protecting against failure. So, admitting that Collins' actions in the case justify the Referee in not giving credence to his testimony, that condition does not exist as to the wife. I do not believe we can dispose of her testimony by saying that she

"simply went along with him."

■■ California law does not sanction the old common-law theory that husband and wife are one, so as to exclude or attaint the wife's testimony. People v. Nesseth, 1954, 127 Cal.App.2d 712, 717, 274 P.2d 479. And the common law which forbade one spouse from testifying for or against the other in an action in which either has an interest has long been abandoned. [See, 58 Am.Jur., Witnesses, §§ 175–190] So the modern American woman is not supposed to be under her husband's "compulsion" when she testifies for him in an action at law. The disqualification of interested parties as witnesses has not existed in California since 1863. [See, Jones v. Post, 4 Cal. 14; Gibson v. Kennedy Extension Gold Min. Co., 1916, 172 Cal. 294, 305, 156 P. 56.] Nor does it exist at the present time anywhere else in the United States, 58 Am.Jur., Witnesses, § 159.

■ It is the rule of the federal courts that uncontradicted testimony may be disregarded if there are in it inconsistencies, or inherent improbabilities or facts contradict it. Quock Ting v. United States, 1891, 140 U.S. 417, 420–421, 11 S.Ct. 733, 35 L.Ed. 501; Grace Bros. v. C. I. R., 9 Cir., 1949, 173 F.2d 170, 174. But when such testimony is not inherently improbable or deficient in other respects, it cannot be disregarded *merely because given by an interested party.* Chesapeake & Ohio Ry. Co. v. Martin, 1931, 283 U.S. 209, 215–216, 51 S.Ct. 453, 75 L.Ed. 983; Pence v. United States, 1942, 316 U.S. 332, 339–340, 62 S.Ct. 1080, 86 L.Ed. 1510; Nicholas v. Davis, 1953, 10 Cir., 204 F.2d 200, 202; San Francisco Ass'n for the Blind v. Industrial Aid for the Blind, 8 Cir., 1946, 152 F.2d 532.

The case last cited epitomizes the rule in a manner that is very appropriate to the problem before us. There the question was whether the *unimpeached testimony of a witness* could be arbitrarily disregarded. In answering in the negative, the Court said:

"The credibility of Mrs. Quinan was not questioned. Her testimony was not impeached or contradicted. It cannot be disregarded. Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 216, 217, 51 S.Ct. 453, 75 L.Ed. 983." San Francisco Ass'n for the Blind v. Industrial Aid for the Blind, supra, 152 F.2d at page 536.

Nicholas v. Davis, supra, states the rule when the sole ground for rejecting the testimony is *interest* in this manner:

"When controlling, positive, and uncontradicted evidence is introduced, and when it is unimpeached by cross-examination or otherwise, is not inherently improper, and no circumstance reflected on the record casts doubt on its verity, then under the principles laid down in Chesapeake & Ohio Ry. Co. v. Martin, 283 U.S. 209, 215–220, 51 S.Ct. 453, 75 L.Ed. 983, *it may not be disregarded*, even though adduced from interested witnesses". Nicholas v. Davis, supra, 204 F.2d at page 202.

Here the estate was created years before the bankruptcy by persons who were recent arrivals in California, were not familiar with our property laws, and from earnings of the husband who, with his wife, was anxious to establish a home in California for his family. In the circumstances, the bare presumption arising from Section 164 of the California Civil Code is overcome by the uncontradicted fact that the property was purchased with community funds as a home, and was placed in the wife's name "for convenience" only. It is true that the property is homesteaded and is beyond reach of the creditors. But the Bankruptcy Act recognizes homestead rights and other exemptions under state law. Bankruptcy Act, § 6, 11 U.S.C.A. § 24. Indeed, it makes it the duty of the Trustee to

"set apart the bankrupts' exemptions allowed by law, if claimed, and report the items and estimated value thereof to the courts as soon as practicable after their appointment". Bankruptcy Act, § 47, sub. a(6), 11 U.S.C.A. § 75, sub. a(6).

The homestead may be carved out of community property or out of separate property of each of the spouses. California Civil Code, § 1238. When a wife converts her separate property into community property, she *loses* many of the rights which are incident to her separate ownership, such as *non-liability* for the husband's debts and the *right to convey* the property without the consent of the husband. California Civil Code, §§ 162, 171. By contrast, if the property were community property, the husband would have the right of management. California Civil Code, § 172(a). In view of this, it cannot be said that the *interest* of the wife was such that she stood to gain so much by an adjudication that the property was community property, that her testimony should be rejected. In the light of the facts stated, if, as the Referee says, the wife "went along", with the husband's version of the transaction, the inference is inescapable that she did so because it was her and her husband's intention to hold their home as community property.

We should not retroject to 1951 the "delinquencies" of the husband in this bankruptcy so as to impeach the integrity of a property purchase consummated in 1951, long before the husband failed in business,—a purchase which was intended to establish a home for the family of the debtor with the savings of thirteen years of married life. It is conceded that if to the assets are added the equity in the house, the alleged bankrupt is not insolvent.

It follows that the Referee was wrong in declining to consider the value of this equity in determining the matter and that his finding of insolvency is clearly erroneous.

The Order of the Referee is reversed.