[Civ. No. 14379.   First Dist., Div. Two.   Dec. 26, 1950.]

WALTER M. CHURCH, Respondent, v. HEADRICK AND BROWN (a Copartnership), Appellants.

Tinning & DeLap and J. Vance Porlier for Appellants.

Russell F. King for Respondent.

SCHOTTKY, J. pro tem.—Respondent sued several groups of defendants for damages arising from personal injuries sustained by him while assisting in unloading a large steel girder at the plant of defendant Butler Manufacturing Company at Richmond, California. The jury returned a verdict for $47,500 against Bern Headrick, Sr., and Russell Brown, copartners doing business as Headrick and Brown, and Thomas Goff, their employee. A motion for judgment notwithstanding the verdict was denied. A motion for new trial was denied, and this appeal was then taken from the judgment by Headrick and Brown only.

We shall summarize the factual situation as disclosed by the record.

The girder in question was 81 feet 7½ inches long, 4 feet 1¾ inches high, 26 inches wide and weighed approximately 13 tons. Attached to one side of it was a catwalk built of lumber which, with other gear attached to it, weighed ap-

proximately 3 tons. When respondent was injured the girder and catwalk rested on a semitractor and dolly, one end on the semitractor (on a "bolster") the other end on the dolly with a considerable part of it overhanging the rear of the dolly. The girder was destined to become a traveling crane to be set up under the roof of defendant Butler Manufacturing Company's factory building over 50 feet above the floor, extending from one side wall of the building to the other, and set on tracks running longitudinally from one end of the building to the other. The "semi" and its dolly (both called, for short, the truck) belonged to defendant Thomas Rigging Company, and defendant Alfred Dalzell was its driver.

The girder had been purchased by Butler Manufacturing Company from defendant W. J. Ferris, who was in the machinery business in Oakland under a contract which obligated Ferris to deliver it to the Butler factory in Richmond. Ferris contracted with defendant Thomas Rigging Company to haul the girder first from the Ferris plant in Oakland to the plant of defendant Osborn Manufacturing Company in San Leandro, (where the girder was to be extended in length 13 feet) and to then haul it from the Osborn plant to the Butler factory in Richmond.

On April 1, 1948, Osborn had finished the work of adding to the girder and it was ready for its final trip. Early that morning defendant Dalzell was preparing to start for San Leandro with his semitractor and dolly. Respondent, who had theretofore worked for defendant Thomas Rigging Company, showed up at the Thomas yard at Emeryville looking for work but was told at the office that there was nothing for him that day. Dalzell knew respondent from his former employment with Thomas, and while Dalzell was putting gasoline in his truck he saw respondent waiting around. When Dalzell drove away for San Leandro respondent climbed aboard the truck and after they were underway he asked Dalzell his destination and was told San Leandro. As respondent put it, he went along as company. There is no contention by respondent that he was in the employ of defendant Thomas Rigging Company at any time that day.

At the Osborn plant the girder was lifted by Osborn's crane onto Dalzell's truck. It was part of Osborn's contract with Ferris to do this. In so lifting it a "choke" sling was used, and the task of lifting it and setting it down on the semitractor and dolly was safely accomplished by the de-

fendant Moller who was an employee of Osborn's. It was set on Dalzell's truck on the level ''on an even keel,'' resting on its 26-inch side. The testimony shows that in handling a piece of equipment of this type the sling around it cannot be released until the girder has been securely fastened to the truck. The process of securing it to the truck, so the testimony shows, is the responsibility of the teamster, and so after it was set on the truck by Moller, Dalzell went about the task of securing it to the semitractor and dolly. This was done by four chains, two around the front unit (the semi-tractor) and two around the rear unit (the dolly) the chains being rigged around the load belt-fashion. On each chain was a binder, the function of which is to tighten or ''cinch'' the chains so there is no slack whatever left in them.

As already appears the four chains were rigged around the load, two on the front unit of the truck, two on the rear unit. The chains were around the metal part of the load (excluding the wooden catwalk) beltwise. The two front chains were about 4 feet apart and the two rear chains were about 4 feet apart. The chains ran over the top of the girder, and came down at an angle of about 45 degrees to the side of the truck and then presumably underneath the truck. On each chain, on the right side of the load, and near the top thereof, was the metal binder with a handle thereon. The function of the handle is to cinch or tighten the chains by leverage, and whenever the handles do not exert sufficient leverage to take all slack out of the chains, a pipe longer than the handle is used to exert leverage. Pipes 4 or 5 feet long were used for this purpose by being slipped over the handles (being longer than the handles there was more leverage).

In adjusting the load at the Osborn plant for its final trip to Richmond the pipe method was resorted to, and Dalzell while using the pipe on the handles of the binders had respondent (a large, heavy man) aid him by adding his weight and strength in getting the utmost of pressure on the handles and thus tightening the chains around the metal part of the load. On the trip from San Leandro to Richmond Dalzell stopped the truck and in examining the chains found one of them somewhat loosened. He tightened it with respondent's aid and resumed the trip.

Arriving at the Butler plant the truck was driven to a point within the reach of the crane which was to hoist it from the truck. The truck was headed to the east, which left the dolly toward the west, the right side of the truck (the side

on which were the binders) was to the south and the left side of the truck (the side on which was the catwalk) was to the north.

We have already noted that in loading a girder of this type the sling cannot be removed from the load until the chains have been cinched up taut. By the same token in unloading it, the chain binders cannot be released until the sling for unloading the girder has been put around the load. This was done under the direction of defendant Thomas Goff, an experienced rigger and an employee of appellants. He put on a so-called "cradle" sling, not a choke sling as had been used in loading it at Osborn's. Goff put on the sling and signalled to the crane operator aloft, to slowly hoist, just enough to take the strain off the truck but not enough to do more than that. Obviously this was so that when the binders were released and the chains loosened the load would be safely within the grasp of the sling.

Such was the situation when Goff indicated to Dalzell that the time had come to release the chain binders.

It is probably evident from what has been said respecting the process of tightening the chains sufficiently to hold this 16-ton load securely on the truck during a 15-mile trip from San Leandro to Richmond that the tension on the chains was something to be reckoned with. There is no dispute in the evidence with respect to such tension. Respondent had assisted with the tightening of the chains by the added leverage of pipe plus handle, and had had experience as a teamster in hauling loads which had to be secured to the truck by chains and binders, although he testified that he had never before worked on a load of this type.

He testified that in releasing the binders one could not take hold of the handles thereof. The procedure was to put one's hand underneath the handle and "flip" it up, otherwise (if grasped) it would break one's arm, such was its force when the tension was released. In flipping the handle one had to stand well back to avoid its impact.

When Goff indicated that the binders would be released Dalzell released the two on the rear end of the load without incident. Dalzell then asked respondent to release the two on the front end. Respondent climbed onto the semitractor, standing on the lower part of the girder where he had foothold. With his back to the cab of the truck he flipped the handle of the binder nearest the cab with his hand as in-

dicated and the handle flew up without doing any damage and apparently fell back of its own weight into a flat position. This left but one chain under tension. With his back still to the cab he bent over to release the remaining binder (about 4 feet to the rear of the one he had already released) and as he flipped the handle of that (second) binder the handle of the first binder (already released and recumbent) flew up for the second time. He was in its way and it hit him on the head and knocked him from the truck onto the ground causing the injuries for which he sues. He was thrown away from the truck, toward the south. With the tension of the last binder thus released the load tilted to the left (northerly) on the catwalk or heavy side, in the direction opposite to that in which respondent was thrown.

Respondent admitted that he had flipped these two chain binders ''as a favor'' to Dalzell, the truck driver. Dalzell had asked him to do so. He was not an employee of anybody at the time. He had come on the truck for the ride and to keep Dalzell company. He testified, moreover, that he thought he could learn something by going on the trip.

Aditional facts will be hereinafter set forth in discussing the various contentions made.

Appellants, in an able and exhaustive brief, contend that the state of the record is such that the verdict in favor of respondent is unsupported by the evidence. ■ It is a familiar rule that before an appellate tribunal is justified in reversing a judgment upon the ground of the insufficiency of the evidence, it must appear from the record that, accepting the full force of the evidence adduced, 'together with every inference favorable to the prevailing party which may reasonably be drawn therefrom, it still appears that the law precludes the prevailing party from recovering a judgment. The evidence must be construed most strongly against the party against whom the judgment is rendered. Every favorable inference which may fairly be deduced from the evidence should be resolved in favor of the prevailing party. Evidence favoring the prevailing party must be accepted as true by the appellate tribunal and contradictory evidence must be disregarded. Bearing in mind this familiar rule, which, we are constrained to state, is too often not properly evaluated by counsel who insist upon arguing the weight of conflicting evidence before an appellate tribunal, we shall proceed to discuss the points urged by appellants herein.

██ Appellants first contend that "the respondent by his own act in voluntarily assisting in unloading the girder which he knew to be a dangerous operation assumed all the risks arising therefrom."

Appellants quote the general rule concerning assumption of risk as stated in California Jurisprudence as follows:

"One who, for purposes of his own, voluntarily places himself in a position of danger, assumes the risks ordinarily incident to such a position, and must exercise a quantum of care commensurate with the additional danger. But such person assumes only those perils which are naturally incident to the position assumed, and not dangers which can come only from the negligent act of another. Thus it is incumbent upon one having knowledge of another's position of peril to use precautions in order to avoid injury, and a person may not contend that, owing to the nature of his business, injury to others as a result of his negligence must result, so that persons who congregate in the vicinity of such business assume the risk. It has been stated that the question of what risks are assumed by one in a perilous position is at most a mixed inference of law and fact." (19 Cal.Jur. pp. 589-590.)

They also quote from Restatement of the Law of Torts, volume 4 at page 491, paragraph 893:

"A person who knows that another has created a danger or is doing a dangerous act or that the land or chattels of another are dangerous, and who nevertheless chooses to enter upon or to remain within or permit his things to remain within the area of risk is not entitled to recover for harm unintentionally caused to him or his things by the other's conduct or by the condition of the premises, except where the other's conduct constitutes a breach of duty to him or to a third person and has created a situation in which it is reasonably necessary to undergo a risk in order to protect a right or avert a harm."

In *Ziesemer* v. *McCarty*, 71 Cal.App.2d 378, the court said at page 381 [162 P.2d 857]:

"The doctrine of assumption of risk presupposes the existence of a dangerous situation or condition, known to the plaintiff, who nevertheless chooses to enter upon or to remain within the area of risk (893 Rest. Torts. p. 491, Vol. 4)."

Appellants argue that the only inference that can be drawn from the evidence is that respondent, with full knowledge of the dangerous situation, voluntarily and unnecessarily placed

himself in a position where he could be injured. The implied finding of the jury was to the contrary. We have read the record carefully and are convinced that the determination of this question was for the jury. Appellants lay great emphasis on certain portions of respondent's testimony of which the following quotation is one:

"Q. Now, Walter, tell me this: In your experience where you were operating with chains and chain binders—I will withdraw that. I will ask you if you yourself ever hauled a load where it was necessary to use a crane to lift it off of the equipment? A. Yes, sir.

"Q. And in addition to loads you have carried on your truck you have been in the yards when that operation has taken place, haven't you? A. I don't quite understand the question.

"Q. Well, you say at times when you hauled a load it was necessary to take that load off the truck you were driving with a crane? A. Yes, sir.

"Q. Now, at other times when you have been in yards of your employers, be it Arris-Knapp or Thomas Rigging, or whoever it might be, you have been present at times when you have seen loads unloaded from trucks by the aid of cranes haven't you? A. Yes, sir, I have.

"Q. All right. And you know that when that operation takes place, the people that are not actually engaged in the unloading get back away from the load. That is the practice, isn't it? A. That is the practice, yes, sir."

"Mr. Richard. I will reframe it and ask this: Wasn't the reason you did that, it was just common sense, that is, you get away from where there might be any danger; that is correct, isn't it? A. Yes, that is correct."

But there is also evidence in the record that while respondent, a young man 24 years of age, had had experience as a teamster and a truck driver, he had had no experience as a rigger; had never hauled this type of load; did not know the type of rigging put on the girder by Goff; had never seen this type of rigging; did not know the girder was side heavy; had never hauled heavy loads that no warning was given him; that he did not know that this particular operation was dangerous. The jury, of course, heard and observed all of the witnesses, including respondent. The jury was fully and fairly instructed as to the doctrine of assumption of risk. If the evidence were susceptible of no other construction than the one appellants have placed upon it,

we would be inclined to agree with their contention. But as hereinbefore pointed out we must resolve in favor of respondent every favorable inference which may fairly be deduced from the evidence and we must disregard evidence which merely contradicts such inference. We are, therefore, unable to agree with appellants that the evidence compels a finding that respondent by his own acts voluntarily, and with knowledge of the danger, placed himself in a position of danger and assumed all of the risks arising therefrom.

Appellants next contend that respondent was a trespasser, or at best, a licensee, and that appellants are not responsible for injury resulting from a defective condition of the premises.

In view of the fact that respondent rode into the property of Butler Mfg. Company, where the girder was to be unloaded, with Dalzell, the operator of the truck, who was undoubtedly an invitee, it is difficult to understand how he could be considered a trespasser. · If under the circumstances here present respondent was not an invitee he was at least a licensee.

The rule as to the duty owed to a licensee by the owner or possessor of premises has been well stated by our Supreme Court in *Oettinger* v. *Stewart*, 24 Cal.2d 133, p. 138 [148 P.2d 19, 156 A.L.R. 1221], as follows: "In other cases it has been suggested that a duty of ordinary care is not owed to a licensee even though injury resulted from active conduct rather than mere passive condition of the premises. (Citations.) The prevailing view is to the contrary, however, and it is now generally held that in cases involving injury resulting from active conduct, as distinguished from condition of the premises, the landowner or possessor may be liable for failure to exercise ordinary care toward a licensee whose presence on the land is known or should reasonably be known to the owner or possessor. (Rest., Torts, § 341; Prosser on Torts [1941], 630; 45 C.J. 803-805.) In Prosser on Torts, *supra,* the author explains: 'Some courts have gone so far as to say that there is no duty to a licensee other than to refrain from inflicting wilful or wanton injury upon him. As in the case of trespassers, however, an increasing regard for human safety has led to a retreat from this position. It is now generally held that as to any active operations which the occupier carries on, there is an obligation to exercise reasonable care for the protection of a licensee. He must run his train, operate his machinery, or back his truck with due regard for the possibility that the permission given may have been accepted

and the guest may be present.' The more recent California decisions have adopted this rule. (Citations.) The cases cited herein suggesting that a lesser standard of care is applicable where injury results from active conduct of the landowner or possessor are inconsistent with the later decisions and must be disapproved." See also *Newman* v. *Fox West Coast Theatres,* 86 Cal.App.2d 428, 431 [194 P.2d 706] ; *Lindholm* v. *Northwestern Pac. R. Co.,* 79 Cal.App. 34, 40 [248 P. 1033].

Appellants argue that the girder, after the slings had been applied by Goff, the employee of appellant Headrick and Brown, was a condition of the premises. In support they quote the following language from the case of *Brust* v. *C. J. Kubach Co.,* 130 Cal.App. 152, 161 [19 P.2d 845] : ". . . a licensee, or his heirs, as here, can recover damages only for an overt act of negligence on the part of the defendant pursued. Appellants even assure us that an owner is not bound 'to keep his premises safe toward a mere licensee.' How do these matters affect the present case? Here there was no overt act or any act of negligence. The rope by means of which the cable was being lowered simply broke, as we have observed . . . But the condition of the rope was entirely immaterial to the case of appellants. If it be granted that it was rotten, the circumstance merely indicates that Kubach Company had failed 'to keep its premises safe' as to the licensee."

In the cited case Brust was killed in an accident which occurred during the construction of the Los Angeles city hall. Kubach was the general contractor. Baker Company was an independent contractor engaged in installing the elevators and Brust was an employee of this company. Kubach allowed the Baker Company the use of a tower and its equipment for the purpose of lowering the elevator motor in place. This work was done by means of $\frac{7}{8}$ inch wire cable which was reeved through two blocks. The blocks were the property of the Baker Company, but the tower, wire cable and all instrumentalities used in lowering the motor, with the exception of the blocks, were the property of and under the general control of Kubach. Brust had been engaged the day before in lowering the motor of his employer Baker Company and the work was completed about 4:30 p. m. of a certain afternoon. On the following day Brust returned to the city hall building for the purpose of removing from Kubach Company's hoisting instrumentalities the said hoisting blocks belonging to the Baker Co. He found that he and his men could not have

immediate access to said blocks or immediately engage in the physical work of removing them because of the fact that Kubach's employees were then operating Kubach's hoisting instrumentalities in its work. While awaiting an opportunity to reach and remove said hoisting blocks Brust had walked out on to the platform adjacent to said hoisting tower, at the 25th floor of the building when the rope by which said hoisting equipment was then being lowered by Kubach Company's employees, broke or parted, permitting a steel cable, attached to said hoisting instrumentalities to fasten itself about the shoulders and neck of Brust, causing his death.

In the action by Brust's heirs against Kubach Co. the jury returned a general verdict in favor of defendant and also in special verdicts found that Brust was on the platform solely in pursuance of the business of Baker Co.; that the fall of the cable was not due to any defect in defendant's equipment; that the proximate cause of the fall of the cable was the parting of the rope, cause unknown. The judgment was affirmed upon appeal, the court saying in addition to the quotation cited by appellants: ''Of course, the Baker Company had the right to the possession of its blocks at some time, but its servants could not take them until permission was given by the Kubach Company, or, at least, until the tower was idle and they might then perhaps be taken under a permission to be implied under such circumstances. The fact that Brust was 'waiting' is enough of itself to show that he had no business on the platform of the tower. If he chose to 'wait' there he did so at his own risk. The series of quotations we have taken from appellants' reply brief shows, without looking elsewhere, to our minds, that Brust was a mere trespasser while he stood upon the platform and when his life was wrenched away in such a cruel and heart-rending manner. There is absolutely nothing in the evidence to indicate that at that unhappy moment he was either an invitee or a licensee. Upon such a conclusion we are bound to affirm the judgment.'' The court then went on to say that even if it were conceded that at the time of his death Brust was a licensee on the platform the result would be the same so ''there was not the slightest showing of any overt act of negligence by the servants of Kubach Co.''

Respondent, in reply, asserts the Brust case is easily distinguishable from the instant case, and that appellants are not justified in arguing that the negligent rigging of the girder by defendant Goff preparatory to lifting it from the

truck, and which operation had to be temporarily interrupted for the release of the chain binders, was a negligent condition of the property and not an overt act of negligence. Respondent argues that there was a wealth of evidence that a choke sling should have been used instead of a cradle sling and respondent refers to testimony of various witnesses which seems to support this contention. Respondent also sets forth testimony of defendant Goff to the effect that the slipping, or shifting or tilting of the girder could have been prevented by using a choke sling instead of a cradle sling but that he didn't feel it was necessary. Goff also testified that the tilting or turn would occur after the binders were released, if at all; that he gave no warning that the load might tilt or shift or turn in the slings because he didn't expect anything drastic to happen; that he was watching respondent as he released the binders.

The jury was fully instructed as to who are invitees, licensees and trespassers and as to the duties owed to them by the occupiers of premises. The verdict of the jury against appellants carries with it the implied finding that the injury to respondent did not result from a defective condition of the premises but that such injury was due to an overt act of negligence on the part of appellants and defendant Goff. Taking the record as we find it, and resolving in favor of respondent, as we must, every favorable inference which may fairly be deduced from the evidence, we are convinced that the implied finding of the jury upon this issue is supported by the record.

The next contention of appellants is: "Assuming for the purpose of argument that Goff, the employee of Headrick & Brown, was negligent in the manner in which he chose to unload the girder and that the beam did tilt, it was not the proximate cause of the injury."

We have hereinbefore stated we are convinced that the implied finding of the jury that the injury to respondent was due to an overt act of negligence on the part of appellants and defendant Goff is supported by the record. We are likewise convinced that the implied finding of the jury that such negligence was the proximate cause of respondent's injury is supported by the record.

It is, of course, the law, as quoted by appellants from *Johnson* v. *Union Furn. Co.*, 31 Cal.App.2d 234 at p. 237 [87 P.2d 917], that:

"It is well settled that in order to maintain an action for damages based on the wrongful act or neglect of another, a

plaintiff must allege and prove that the wrongful act of the defendant was a direct and proximate cause of the injury (citing case). In other words, 'To impose liability it is not enough to show that an injury would not have occurred in the absence of a negligent act, but it must be shown that the act was the efficient cause of the injury—the act from which the injury followed in continuous sequence unbroken by any efficient intervening cause. Thus even though one has been guilty of negligence, he may still not be liable . . . if such negligence is remote in the chain of causation and did not contribute proximately to the injury. . . . ' And in this connection it is held generally that the word 'proximate' is intended to mean direct or immediate, as opposed to remote . . . care must be taken to avoid confusing two elements which are separate and distinct, namely, that which causes the injury, and that without which the injury would not have happened. For the former the defendant may be liable, but for the latter he may not . . . In Sedgwick on Damages, ninth edition, volume 1, page 200, the rule is stated thus: 'Two entirely independent conditions must be satisfied. First, to be proximate and entail legal responsibility, a cause must be one but for which the result would not have happened. Second, not only must this test be satisfied, but also this cause must be active enough in the result for it to be regarded in the law as efficient in responsibility.' "

■ Appellants refer to certain portions of the testimony in support of their contention that there was no connection between the tilting or twisting of the load when the last chain binder was released and the flying up of the handle which struck respondent. Respondent in reply refers to testimony of defendant Goff as follows:

"Q. It was not until the second binder, or last binder was released, that the load started to tip toward the left of the cat-walk, is that correct? A. That is right.

"Q. Then as you have described, this handle came up and struck Mr. Church? . . . .

"Q. It is true that this handle came up and struck Mr. Church? A. That is right.

"Q. That was not the handle that he was then and there releasing? A. That is right."

Respondent testified that upon releasing the last chain-binder the girder started to roll away from him and the next thing he knew he was on the ground. Similar testimony appears in the testimony of other witnesses. As is to be expected

in a record of nearly 1,200 pages there is much conflict in the evidence, but we believe it is fairly inferable from the record that the appellants were negligent in putting a cradle sling on the girder when they should have put a choke sling on; that this negligence caused the girder to tilt when the binder was released; and that there was a direct connection between the tilting of the girder and the flying up of the handle that struck respondent.

We believe that the following remarks of the trial judge upon denying appellants' motion for judgment notwithstanding the verdict are supported by the record: "The court thinks that, without any prejudice against Headrick & Brown, if anybody was negligent in the case it was Headrick & Brown, because they had, what you might say, the entire control of unloading that. If that beam was not shored up by lumber and it should have been shored up, there wasn't a latent defect, it was a patent defect; it was open to the view of any skilled rigger. If it were necessary to shore that up before it was unloaded, he was there and saw it, and should have shored it up. And, as an expert rigger, a man at least using ordinary care and skill in rigging, he should have known. Everybody else seemed to know, at least, that the beam was side heavy and that a cradle sling would permit it to tilt . . . So, it puts the situation directly up to Headrick & Brown. They were unloading the beam, and they put a cradle sling on it when they should have put a choke sling on. If it should have been shored up, they had the opportunity to shore it up. And in the court's opinion, if there was anybody negligent in this case, that proximately caused the plaintiff's injury, it was your client, Headrick & Brown, and for that reason I deny your motion."

■ Appellants next contend that respondent was guilty of contributory negligence as a matter of law. Before discussing this contention we quote the language of our Supreme Court in *Anthony* v. *Hobbie*, 25 Cal.2d 814, at page 818 [155 P.2d 826]:

"Turning to the question of contributory negligence on the part of the decedent, certain rules must be remembered. The burden of proving contributory negligence is upon the defendant. (19 Cal.Jur. 697-699.) True, contributory negligence may be found by the trier of fact from the plaintiffs' own evidence. But cases in which it can be said that the negligence of plaintiff contributes proximately to the accident as a matter of law are rare. The rule has been stated in various ways in

a legion of cases, that contributory negligence is not established as a matter of law unless the only reasonable hypothesis is that such negligence exists; that reasonable or sensible men could have drawn that conclusion and none other; that where there are different inferences that may be drawn, one for and one against, the one against will be followed; and that before it can be held as a matter of law that contributory negligence exists, the evidence must point unerringly to that conclusion. (Citations.)"

In view of what we have hereinbefore said relative to appellants' contentions as to assumption of risk, defective condition of the premises and proximate cause, little remains to be said as to appellants' contention that respondent was guilty of contributory negligence as a matter of law.

Appellants quote from Restatement of the Law of Torts, volume II, chapter 17, section 461, page 1232: "Two meanings of 'voluntary assumption of risk'. This form of contributory negligence is frequently called 'voluntary assumption of risk' . . ."

"This phase is also often used to denote the fact that when the plaintiff enters the land or uses the chattels of the defendant or otherwise associates himself with the defendant's activities, having no right or privilege to do so save that derived from the defendant's consent, the defendant owes him no duty except to warn him of those dangers of which the defendant knows or should know and of which the defendant has reason to expect the plaintiff to be ignorant. Since the defendant is under no duty to warn the plaintiff of dangers which are known or obvious to him, the plaintiff must choose at his own risk whether or not he shall avail himself of the defendant's consent and has no legal ground of complaint against the defendant if his choice proves unfortunate. Thus, by deciding to act upon the defendant's consent with knowledge of the dangers involved therein, the plaintiff may not improperly be said to have assumed the risk."

Appellants argue that there was no duty on their part to warn respondent as they had no reason to believe that respondent was ignorant of the danger attendant upon raising the girder and releasing the chain binders. They assert that appellants were entitled to presume that respondent understood and appreciated the danger attendant upon releasing the chain binder handles. Upon this point the comment of the trial judge in denying appellants' motion for a new trial is interesting:

"Now, you have a situation here where Mr. Church goes out with Mr. Dalzell to deliver this crane. He gets out there—there is a conflict in the testimony—Mr. Church says he went up there to unload—untie the chains at the request of Mr. Dalzell, Junior . . . We must assume that because the implied verdict of the Jury shows that, that Dalzell, Junior, requested Church to get up and release those chains. Now, insofar as your client (appellants) is concerned, it is immaterial as to them whether he was a volunteer or whether he wasn't. He was there; they could see what he was doing. The rigger (Goff) putting the rigging on that beam at that time was an experienced rigger. It is true that the evidence shows that Church had some experience as a teamster, but a rather limited experience. He had moved some heavy equipment. He was observed by the Jury. You could see in a way—the Court could see that he was what you would call a big lunk-head . . . he thought he was a real teamster, and he wanted to make a hit with Dalzell for the purpose of getting a job; that was what he was primarily interested in. As a matter of fact, he was what you would call a green teamster. He didn't have a lot of experience in that line of work."

"If it was the proper thing for him to stand on that wheel and release that chain binder—if that was the custom of the business, just the minute he got on to that flange, your clients should have seen he was a green pea and didn't appreciate the danger he was getting into, and your rigger should have told the crane operator to hold it until he fired him down off of that crane, because they had enough stress on that beam—they had lifted it enough so that when all the chains were undone except the last one, they having lifted it enough to take the slack out of the cable, and there was dynamite tightened up in that last chain, and as men of experience your client should have known that. They saw where the first chain tightener was that he released. They saw where he was standing. They, as men of ordinary conduct and experience, should have told the crane operator to hold it until they fired him down off of there.

"In the Court's opinion the Jury has impliedly found that your client, as men of experience, situated as they were, should have foreseen the fact that this lad didn't appreciate the danger that he was in; that they had the power to avoid that accident; that they, nevertheless, went ahead and permitted him to release the last chain binder knowing the kind of a sling they had there. The Jury impliedly found that as

men of ordinary prudence and skill and experience, they should have foreseen what would probably happen to the handle of the first chain tightener that he released, and that the accident was due to the flipping of that handle and not the last handle.''

We are satisfied that the question of whether or not respondent was guilty of contributory negligence was properly submitted to the jury and that their implied finding is supported by the record.

■ Appellants next contend the court erred in admitting in evidence testimony that a different method was used in unloading the girder after the accident had occurred.

The record shows that after plaintiff had rested his case and the defense of codefendants Thomas Rigging Company and Alfred Dalzell commenced, Alfred Dalzell was called as a witness, and over the objection of appellants, described how the girder was unloaded after the accident and what type of slings were used.

Appellants are correct in stating that the rule is that such evidence is not admissible to show prior negligence.

In 10 California Jurisprudence 829-830, paragraph 115, it is stated: ''It is now settled in California, in accordance with the rule generally prevailing elsewhere, that evidence of precautions taken after the happening of an accident is not admissible to show a negligent condition at the time of the accident. Thus evidence is inadmissible to show that defective appliances were repaired after the accident. So, too, evidence is inadmissible to show substitution of a safer appliance after an accident . . . In accord with these principles it has been held that evidence of precautions taken by the defendant after an accident, in the using of other methods of tying his horses, is not admissible to show a negligent condition at the time of the accident.'' See, also, *Anstead* v. *Pacific Gas & Electric Co.*, 203 Cal. 634, 639 [265 P. 487] ; *Meyer* v. *San Francisco*, 9 Cal.App.2d 361 [49 P.2d 893].

■ However, it appears from the record that earlier in the trial the witness Goff was permitted, without objection, to testify as to how the girder was unloaded after the accident, and also that appellants' witness Holeman, after the testimony complained of, under questioning by counsel for appellants also described the procedure used in unloading the girder after the accident. Therefore, in view of section 4½ of article VI of our state Constitution, we do not believe that the overruling of appellants' said objection, even if error, would

justify a reversal of the judgment (*Maddern* v. *San Francisco*, 74 Cal.App.2d 742 [169 P.2d 425]).

▉▉▉ Appellants contend also that the trial court erred in permitting an experiment with a model which had been introduced in evidence for purposes of illustration only. Respondent had prepared a scale model of the girder and upon stipulation of counsel it was stipulated that it was a miniature representation of the girder here involved. Thereafter during the testimony of the witness, the following occurred:

"Mr. King. I think we are getting way off the subject here. Let's simulate two cradle slings—put a cradle sling around this end and one around that end. That would be the ordinary way you would use a cradle sling, isn't that so? A. Yes.

"Q. This, generally speaking, would be the way you would use a cradle sling? A. Yes.

"Q. I want you to grab hold of the end of this bridge girder (model); hold it approximately level; hold it up straight. Now, if you try to lift it up with this cradle sling, what would happen? Let him let go of it and you will see what happens. (Demonstrating.) All right, is that what happens if you try to lift that particular bridge girder in a cradle sling? A. Yes.

"Q. You couldn't possibly load it on a truck that way? A. No.

"Q. You couldn't possibly take it off the truck and lower it down?

"Mr. Porlier. Just a moment. I am going to move to strike all the questions and answers with reference to the demonstration Mr. King has just made, because that Plaintiff's Exhibit 3 was put into evidence for the sole purpose of illustration, and Mr. King's own statement was that so far as the weight was concerned that that was not a model conforming to the weight factors we had in that beam.

"The Court. Well, that is all he was doing was illustrating what would happen.

"Mr. Porlier. But, Your Honor, he was illustrating with reference to weights—he was illustrating with reference to weights. The engineer has testified, if Your Honor please, that in his opinion this beam weighed something in the neighborhood of twelve or thirteen tons, and in his further opinion the catwalk weighed something in the neighborhood of three ton. Now, it is obvious that there is not five times as much weight in this beam as there is in this model catwalk. And

when he used this to demonstrate to you—it was stipulated that it should be admitted for the sole purpose of illustration and not for demonstration. Now, that was counsel's own stipulation and it was his offer.

"The Court. There is no argument on that. . . .

"Mr. Porlier. I move to strike the questions and answers pertaining to the weights just given by the witness and by counsel, and I ask that the Jury be admonished to disregard that demonstration, because definitely the weights on this and the effect of the beam on that weight would be entirely different on the ground that it would with that model.

"The Court. Is there testimony in the case by this witness tending to show why the choke sling was used in the first instance and what would happen if the choke sling were not used?

"Mr. King. Yes, there is.

"Mr. Richard. Yes, there is.

"The Court. Motion denied. I recall the testimony. I can't quote the testimony to the jury—that isn't my province, but the Court is denying the motion."

The admission of models and of testimony of experiments is largely within the discretion of the trial court. (*County of San Mateo* v. *Christen*, 22 Cal.App.2d 375 [71 P.2d 88]; *Collins* v. *Graves*, 17 Cal.App.2d 288, 299 [61 P.2d 1198].) The jury saw the girder itself and also saw the model, and we do not believe that there was any abuse of discretion on the part of the trial court in refusing to strike out said testimony.

The final contentions of appellants are that the trial court erred in denying their motion for a new trial and their motions for a directed verdict and judgment notwithstanding the verdict.

What we have hereinbefore stated makes it unnecessary to discuss those contentions other than to state that the court did not err in denying each of said motions.

The trial of the instant case occupied 10 court days and it was ably tried and bitterly contested. The jury was fully and correctly instructed on the law governing the various questions involved upon this appeal and no prejudicial error appears in the record. Notwithstanding the able and earnest arguments of appellants on this appeal, we are convinced that, taking the record as a whole, and bearing in mind the rule by

which an appellate court is governed, the judgment in favor of respondent finds ample support in the record.

In view of the foregoing the judgment is affirmed.

Nourse, P. J., and Dooling, J., concurred.

A petition for a rehearing was denied January 25, 1951, and appellants' petition for a hearing by the Supreme Court was denied February 19, 1951.