[L. A. No. 24392.   In Bank.   June 21, 1957.]

JOHN S. DAGGETT, Respondent; PAUL R. SMITH et al., Plaintiffs and Appellants, v. THE ATCHISON, TO-PEKA AND SANTA FE RAILWAY COMPANY (a Corporation) et al., Defendants and Appellants.

Melvin M. Belli, William F. Reed and Edwin M. Rosendahl for Plaintiffs and Appellants.

Robert W. Walker, Richard K. Knowlton and Luce, Forward, Kunzel & Scripps for Defendants and Appellants.

Melvin M. Belli, William F. Reed, Edwin M. Rosendahl, Fitz-Gerald Ames, Sr., Lou Ashe, James Boccardo, David Casey, Ben C. Cohen, Robert Ford, Downey A. Grosenbaugh, Holt, Macomber & Graham, Leland V. Lazarus, Raoul Magana, Jack G. McBride, John W. McInnis, Herbert Resner and Ryan & Ryan for Respondent.

Peter C. Morris, Martin B. Berman, William P. Camusi, John Carter, S. M. Dana, Robert F. Diekman, John M. Ennis, Leo Fried, Myron L. Garon, Ned Good, Jerry Giesler, Irving H. Green, Vernon Humber, Hirson & Horn, John R. Inderrieden, Danny R. Jones, Elmer Low, Paul Madden, Mahedy & Schall, Munnell, Shelandor & Mullendore, Denver C. Peckinpah, Samuel B. Picone, Pollock & Pollock, Theodore W. Rosenak, Samuel A. Rosenthal, Harriet Ross, Edgar Simon, Eugene E. Sax, Edward Spraker, John Moran and Jesse E. Nichols as Amici Curiae on behalf of Respondent.

CARTER, J.—Defendants, The Atchison, Topeka and Santa Fe Railway Company, G. H. Benton (motorman), and Irwin M. Pike (conductor) appeal from a judgment in favor of John S. Daggett for the loss of his two minor children in an action arising out of a collision between one of defendant's passenger trains and an automobile driven by Paula Smith Daggett, who died in the same accident, at a railway crossing in Solana Beach. Olga Smith and Paul R. Smith, the parents of Paula Smith Daggett (wife of John S. Daggett) were also plaintiffs in the action but as to them the jury found in favor of defendant railway company.

Neither the negligence of defendants, nor the contributory negligence of Paula Smith Daggett, are issues on this appeal. The only two assignments of error with respect to the evidence relate to the examination of defendant railway's employees called under section 2055 of the Code of Civil Procedure. The facts therefore will be set forth as briefly as possible but with particular emphasis on the disputed evidence.

The accident occurred at approximately 11:18 a. m. on June 25, 1954. It was a clear day. Mrs. Daggett, who was 24 years of age and eight months pregnant, was driving in a westerly direction on Plaza Street, Solana Beach, accompanied by her two minor children, aged 3 years and 10 months, respectively. Defendant's train, which was traveling in a southerly direction at a speed of between 86 and 90 miles an hour crossed the intersection of Plaza Street on its railroad tracks at the same time as Mrs. Daggett's automobile which was estimated to be traveling at a speed of from 10 to 15 miles per hour. Mrs. Daggett and the two minor children were killed in the accident. On the north side of Plaza Street was a lumber company building about 75 feet from the crossing; on the same side of Plaza Street was a railroad siding on which stood a freight car about 100 feet from the crossing. Both the building and the freight car were on Mrs. Daggett's right (the direction from which the train approached the crossing) as she drove westerly on Plaza Street toward the railroad crossing. On the northeast corner (on Mrs. Daggett's right) of the intersection of the tracks and Plaza Street was an automatic wigwag signal located 12 feet 9 inches above the ground; on the southwest corner of the crossing was a standard crossarm. Running parallel to, and a very short distance from, defendant's railroad tracks is the Pacific Coast Highway which intersects Plaza Street after it crosses the tracks. At this intersection there is a traffic

light for vehicular traffic.[1] Ringing circuits for the operation of the wigwag signal were set off by a southbound train at a point 3,023 feet north of Plaza Street where it intersects with the tracks. In view of the speed at which defendant's train was approaching the intersection, this would result in the operation of the automatic wigwag signal for approximately 22 seconds.

Glenn H. Benton, a defendant and the motorman who was operating the train at the time of the accident, was the first witness called by plaintiffs under section 2055 of the Code of Civil Procedure.[2] Mr. Benton testified that the train which he was operating at the time of the accident was a four-unit Diesel with 10 passenger cars; that it was capable of a speed of 100 miles an hour; that at the time of the accident he had the train in throttle "position 8" (the highest speed position) and that the train was going from 85 to 90 miles an hour; that the railroad speed limit for that crossing was 90 miles an hour and that this was considered a safe speed.[3] The witness also testified that on the day in question the train was 15 minutes late and that he was trying to make up time. Mr. Benton testified that the area involved was part of the fourth district and that the speed limit for that district was 90 miles an hour. The witness testified that the speed "*is* 90 now on the first, second, and fourth districts." (Emphasis added.) Over objection by defense counsel the following occurred: " Q. [By plaintiffs' counsel] : Well, Mr. Benton, the restriction now is 50 miles an hour, isn't it?" Plaintiffs' counsel, in answer to the court's question concerning the district to which he was referring, replied: "He is referring to the fourth. He says the restriction in the fourth district now is 90 miles an hour. We are prepared to show that the restriction in this district at this crossing now, rather than being 90 miles an hour, is 50 miles an hour." In response to defense counsel's request to take "this matter" up

---

[1] There was evidence in the record that this light, rather than the automatic wigwag signal predominated the view of vehicular traffic proceeding in a westerly direction on Plaza Street.

[2] A party to the record of any civil action or proceeding . . . may be examined by the adverse party as if under cross-examination, subject to the rules applicable to the examination of other witnesses. The party calling such adverse witness shall not be bound by his testimony, and the testimony given by such witness may be rebutted by the party calling him for such examination by other evidence. . . .

[3] The record shows that an average of 2,500 automobiles crossed the tracks daily at this intersection.

out of the presence of the jury, the court ruled that "He has a right to say what he expects to prove or what he expects to get this witness to testify to. It is cross-examination, a legitimate statement." Over objection by defense counsel, the following took place: "Q. [Plaintiffs' counsel] : Mr. Benton, you say that the speeds in these areas then and now are 90 miles an hour?" After objection and a holding that the question was a compound one, the witness answered a simplified question that the speed "now" at the "Plaza area" was 50 miles an hour.

The second witness called by plaintiffs was William Price, signal engineer for the defendant railway company. Mr. Price, who qualified as an expert witness, and who testified under section 2055 of the Code of Civil Procedure said that he was "absolutely sure" that the type of signal in use at the Plaza crossing at the time of the accident was "the safest type of signal." Counsel for plaintiffs, over objection, questioned the witness and brought out that since the accident the California Public Utilities Commission had requested defendant railway company to change the single wigwag signal to two "flashing light signals" located 8 feet above the ground level. Over objection, the court permitted the jury to view the scene of the accident at a time when a train crossed the intersection. At this time, of course, the speed limit had been reduced and new signals installed. However, photographs of the crossing with the new signals installed had been theretofore admitted in evidence without objection by defense counsel.[4]

Defendants contend that the court committed prejudicial error in admitting evidence of changes made subsequent to the time of the accident. Plaintiffs argue that the evidence was not admitted for the purpose of showing changed conditions but to impeach the witnesses called by them under section 2055. It is also argued by defendants that evidence of changed conditions may not be used to impeach a witness called under section 2055, and that the error was magnified by plaintiffs' counsel during argument to the jury.

█ It is the general rule in this state that evidence of precautions taken and repairs made after the happening of

---

[4] In *Church* v. *Headrick & Brown*, 101 Cal.App.2d 396, 413, 414 [225 P.2d 558], it was held that where evidence of changed conditions was admitted by the court without objection the admission of similar evidence from another witness, over objection, was not ground for a reversal. See also *Dyas* v. *Southern Pac. Co.*, 140 Cal. 296, 306 [73 P.2d 972].

the accident is not admissible to show a negligent condition at the time of the accident. (*Helling* v. *Schindler*, 145 Cal. 303 [78 P. 710]; *Church* v. *Headrick & Brown*, 101 Cal.App. 2d 396, 413 [225 P.2d 558].) The reason for the rule was well stated in *Sappenfield* v. *Main St. etc. R. R. Co.*, 91 Cal. 48, 62 [27 P. 590]: "It would be unjust to hold that because the employer seeks, by all the aid he gets from the light of experience, to make the implement free from danger he is therefore to be charged with negligence in the use of all prior appliances, even though they were adopted with the best light then at his command. . . . He may have exercised all the care which the law requires, and yet in the light of a new experience, after an unexpected accident has occurred, he may adopt additional safeguards. To hold that the adoption of such new appliances which experience has demonstrated are more efficient than those previously in use, or which invention has developed from observing the defects in those originally adopted, shall be an admission that he was negligent prior thereto would prevent the very conduct in employers which they should be urged to follow."

This court has held, however, that "Although evidence of the character here in question may not be admissible to prove negligence at the time of the accident, it is proper to impeach the testimony of a witness. (*Inyo Chemical Co.* v. *City of Los Angeles, supra* [5 Cal.2d 525 (55 P.2d 850)].) In the case at bar, the record discloses that prior to the testimony of the witness Bromfield with relation to the cessation of waxing the floor, said witness had testified that he had 'looked at the floor (immediately after the accident) and— did not notice anything unusual about the floor,' and the defendants at all times maintained that there was nothing wrong with the floor. The evidence of his having later ordered that the floor not be waxed tended to impeach that testimony by showing that he had changed his mind with reference to there being nothing wrong with the floor, and was admissible for that purpose." (*Hatfield* v. *Levy Brothers*, 18 Cal.2d 798, 809, 810 [117 P.2d 841]; see also the following cases holding that evidence of changed conditions is admissible by way of impeachment: *Gorman* v. *County of Sacramento*, 92 Cal. App. 656, 666 [268 P. 1083]; *Uttley* v. *City of Santa Ana*, 136 Cal.App. 23, 28 [28 P.2d 377]; *Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal.2d 525, 543 [55 P.2d 850].)

It is argued by defendants, however, that such evidence is permissible only to impeach evidence produced by the other

party to the action and not for the purpose of impeaching original evidence produced by plaintiffs. The question thus squarely presented is whether an adverse witness called under section 2055 is the witness of the party calling him.

Mr. Wigmore points out (3d ed., III, § 916, p. 431) that "If there is any situation in which any semblance of reason disappears for the application of the rule against impeaching one's own witness, it is when the *opposing party is himself called by the first party,* and is sought to be compelled to disclose under oath that truth which he knows but is naturally unwilling to make known. To say that the first party guarantees the opponent's credibility (*ante,* § 898) is to mock him with a false formula; he *hopes* that the opponent will speak truly, but he equally perceives the possibilities of the contrary, and he no more guarantees the other's credibility than he guarantees the truth of the other's case and the falsity of his own. To say, furthermore, that the first party, if he could impeach at will, holds the means of improperly coercing the other (*ante,* § 899) is to proceed upon a singular interpretation of human nature and experience, and to attribute a power which the former may perhaps wish that he had but certainly cannot be clothed with by this or any other rule. There is therefore no reason why the rule should apply at all." (Emphasis that of the author.)

This court held in *Smellie* v. *Southern Pac. Co.,* 212 Cal. 540, 556 [299 P. 529], that a witness called under section 2055 "does not stand in the same relation to the party calling him as does a witness who is called under ordinary conditions. He is more in the nature of a witness of the adverse party. . . . Such a witness has none of the characteristics of a witness called by a party under the ordinary rules of procedure, but many of the characteristics of a witness called by the adverse party." (See also 26 So.Cal.L.Rev. 105.)

Section 2055 provides that a party to the action may be examined by the adverse party as if under cross-examination, subject to the rules applicable to the examination of other witnesses. (*Figari* v. *Olcese,* 184 Cal. 775 [195 P. 425, 15 A.L.R. 192]; *Weck* v. *Los Angeles County Flood Control Dist.,* 80 Cal.App.2d 182 [181 P.2d 935].) Section 2048 of the Code of Civil Procedure provides that "The opposite party may cross-examine the witness as to any facts stated in his direct examination or connected therewith, and in so doing may put leading questions, but if he examines him as to other matters, such examination is to be subject to the same rules

as a direct examination." It will be recalled that plaintiffs called defendant Benton and defendant railroad's agent, Pike, as the first two witnesses at the trial. Prior to their testimony there had been no direct examination. ■ Section 2055 has been held to be remedial in character and a statute to be construed liberally to the end that litigants would be afforded an opportunity to elicit from adverse parties the facts which those parties have in their sole possession. (*Smellie* v. *Southern Pac. Co.*, 212 Cal. 540, 556 [299 P. 529] ; *Lawless* v. *Calaway*, 24 Cal.2d 81, 90 [147 P.2d 604].)

It has been heretofore held that the party calling a witness under section 2055 does not vouch for the credibility of such witness (*First Nat. Bank of Petersburg* v. *Shipley*, 109 Cal. App. 194 [292 P. 996]) ; that the calling party may impeach the witness (*Batchelor* v. *Caslavka*, 128 Cal.App.2d 819, 822 [276 P.2d 64] ; *Kambourian* v. *Gray*, 81 Cal.App.2d 783, 789 [185 P.2d 27] ; *Frymire* v. *Brown*, 94 Cal.App.2d 334, 341 [210 P.2d 707] ). ■ In the Batchelor case the court said : "Section 2055 does not mean that the testimony of an adverse witness may not be given its proper weight. It merely means that the party calling such witness shall not be precluded from rebutting his testimony or from impeaching the witness ; such testimony is to be treated as though given on cross-examination." We held in *Lawless* v. *Calaway*, 24 Cal.2d 81, 90 [147 P.2d 604], that "Any relevant matter in issue in a case is within the scope of the examination of witnesses called pursuant to the provisions of such [2055] statutes." ■ The extent to which cross-examination of a witness may be carried rests, of course, largely within the discretion of the trial court and the same rule applies to a witness examined under section 2055. (*Paul* v. *Key System*, 80 Cal.App.2d 21, 27, 28 [180 P.2d 940] ; *Scott* v. *Del Monte Properties, Inc.*, 140 Cal.App. 2d 756, 763 [295 P.2d 947] ; *Cooper* v. *National Motor Bearing Co.*, 136 Cal.App.2d 229, 232 [288 P.2d 581].)

■ It has been held that the limited cross-examination rule does not prevent questions on cross-examination as to matters affecting the accuracy or credibility of the witness (*Cooper* v. *National Motor Bearing Co.*, 136 Cal.App.2d 229, 232 [288 P.2d 581] ; *Voll* v. *Hollis*, 60 Cal. 569 ; *People* v. *Alcalde*, 24 Cal.2d 177, 184 [148 P.2d 627] ; *People* v. *Showers*, 90 Cal.App.2d 248, 254 [202 P.2d 814] ; *Luis* v. *Cavin*, 88 Cal.App.2d 107, 114 [198 P.2d 563] ; *People* v. *Tallman*, 27 Cal.2d 209 [163 P.2d 857]). In the Tallman case, this court said (at page 214) : "A wide latitude is permitted in the

cross-examination of an expert witness in all matters testing his credibility so that the jury may determine the weight to be given the testimony. . . .'' And in *People* v. *Vollmann,* 73 Cal.App.2d 769, 790 [167 P.2d 545], the court held that it was proper when discrediting a witness by his own admissions to cross-examine him as to inconsistent statements without laying a foundation.

It is obvious that the adverse party, or witness, called under section 2055 is not the witness of the party calling him (*Smellie* v. *Southern Pac. Co.,* 212 Cal. 540 [299 P. 529]; *Figari* v. *Olcese,* 184 Cal. 775, 782 [195 P. 425, 15 A.L.R. 192]) inasmuch as the code specifically provides that such calling party shall not be bound by the testimony of such adverse party. When the various rules (heretofore set forth) are summarized it appears that a party calling a witness under section 2055 does not vouch for his credibility (*First Nat. Bank* v. *Shipley,* 109 Cal.App. 194, 200 [292 P. 996]); that the calling party may impeach such a witness (*Batchelor* v. *Caslavka,* 128 Cal.App.2d 819 [276 P.2d 64]; *Green* v. *Newmark,* 136 Cal.App. 32, 37 [28 P.2d 395]); and, according to the section itself, may examine such a witness as if on cross-examination; and that the limited cross-examination rule does not prevent questions on cross-examination as to matters affecting the accuracy or credibility of the witness (*Voll* v. *Hollis,* 60 Cal. 569, 576). Applying these rules to the situation at hand, the record shows that the witness Benton, called under section 2055, stated that the speed limit set by defendant railway company for the Plaza Street crossing was, at the time of the accident and at the time of trial, 90 miles an hour; that the signal expert, an employee of defendant railway company, testified, under section 2055, that the wigwag signal in place at the time of the accident was the safest type of automatic warning device. Counsel for plaintiffs showed, during the cross-examination, and by way of impeachment, that, in the first instance, the speed limit was not 90 miles an hour at the time of trial but 50 miles an hour, and, in the second instance that, by reason of the request of the Public Utilities Commission, the wigwag signal in place at the time of the accident had been replaced with flashing red lights. This was proper cross-examination and was ''for the purpose of weakening the testimony of defendant's expert witness by showing that he had subsequently changed his opinion as to the . . .'' safety of the conditions prevailing at the time of the accident. (*Inyo Chemical Co.* v. *City of Los Angeles,* 5 Cal.2d 525, 543 [55 P.2d 850].)

Defendants next argue the applicability of the latter part of section 2055 which provides that the testimony given by such adverse witness "may be *rebutted* by the party calling him for such examination *by other evidence.*" (Emphasis added.) Plaintiffs' counsel was not here seeking to rebut the evidence elicited under section 2055 but was endeavoring to impeach the witnesses by showing that the facts testified to by such witnesses were not the true facts. The statements of both witnesses, one as to the speed limit at the Plaza crossing at the time of trial and the other as to the wigwag signal being the safest type of signal, could be considered as having been volunteered by the witnesses prior to the impeaching questions asked by plaintiffs' counsel. In addition, Benton testified as to the safety aspect of the 90 mile an hour speed limit and Price testified that the wigwag signal in place at the time of the accident was the "safest type." The record shows no request by defense counsel that the jury be admonished as to the limited purpose for which the impeaching evidence was admissible either at the time the questions were asked or at the close of the trial when the jury was instructed as to the applicable law. Insofar as plaintiffs' counsel's argument to the jury is alleged to have magnified the error of the admission of such evidence, the record discloses that no objection was made thereto by defense counsel.

▇ There appears to be no sound reason why evidence of the type under consideration since admissible for impeachment purposes (*Hatfield* v. *Levy Brothers*, 18 Cal.2d 798 [117 P.2d 841] ; *Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal. 2d 525 [55 P.2d 850]), should not be admissible for the purpose of impeaching a witness called under section 2055 of the Code of Civil Procedure since such a witness "does not stand in the same relation to the party calling him as does a witness who is called under ordinary conditions. He is more in the nature of a witness of the adverse party. . . ." (*Smellie* v. *Southern Pac. Co.*, 212 Cal. 540, 556 [299 P. 529].) ▇ The rule is well settled that if evidence is admissible for any purpose it must be received, even though it may be highly improper for another purpose. (*Mohn* v. *Tingley*, 191 Cal. 470 [217 P. 733].) In jury trials, however, the other party is entitled to an instruction limiting the purpose for which the evidence may be considered (*Hatfield* v. *Levy Brothers*, 18 Cal. 2d 798 [117 P.2d 841] ; *Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal.2d 525 [55 P.2d 850] ). ▇ But where evidence

is admissible for a limited purpose only, it is not the duty of a judge to instruct the jury as to such purpose unless requested to do so (*Lewis* v. *Southern Pac. Co.*, 98 Cal.App.2d 358, 362 [220 P.2d 431]; *Packard* v. *Moore*, 9 Cal.2d 571, 573 [71 P.2d 922]; *Craig* v. *Boyes*, 123 Cal.App. 592, 600 [11 P.2d 673]). Having failed to request an instruction that the impeaching evidence was admitted only for that purpose and was not otherwise competent, defendants may not now complain. (*Hatfield* v. *Levy Brothers*, 18 Cal.2d 798, 810 [117 P.2d 841]; *Inyo Chemical Co.* v. *City of Los Angeles*, 5 Cal.2d 525, 544 [55 P.2d 850].)

Defendants contend that the award of damages of $50,000 to plaintiff John S. Daggett for the loss of his two minor children was so excessive that it must have been given under the influence of passion and prejudice. Defendants concede that each case is to be determined upon its own facts (*Christy* v. *Ulrich*, 113 Cal.App. 338 [298 P. 135]) but argue that the factors to be considered in an award of damages to a parent for the death of his children are the loss of comfort and society to the parent of the children and the loss of the subsequent protection of the parent by the children, "mitigated, however, as harsh as such a rule may seem, by the pecuniary gain of the parent in the elimination of the expense of rearing the children." The jury was so instructed and no contention is made that the jury was not properly instructed as to the factors involved in an action of the type under consideration.

While a reviewing court, in passing upon the question involved here, may consider amounts awarded in similar cases (*Osrowitz* v. *Market Investment Co.*, 40 Cal.App.2d 179, 185 [104 P.2d 681]; *Power* v. *California St. Cable R.R. Co.*, 52 Cal.App.2d 289, 292 [126 P.2d 4]), in the final analysis the question in each case must be determined from its own peculiar facts and circumstances (*Kirshbaum* v. *McCarthy*, 5 Cal.2d 191 [54 P.2d 8]) and it cannot be held as a matter of law that a verdict is excessive simply because the amount may be larger than is ordinarily allowed in such cases. It is only in a case where the amount of the award of general damages is so disproportionate to the injuries suffered that the result reached may be said to shock the conscience, that an appellate court will step in and reverse a judgment because of greatly excessive or grossly inadequate general damages. (*Tyson* v. *Romey*, 88 Cal.App.2d 752, 757 [199 P.2d 721].)

Taking into consideration the facts and circumstances presented by the case under consideration we cannot hold, as a

matter of law, that the award of damages to John S. Daggett for the loss of his two minor children, aged 3 years and 10 months, respectively, is so greatly excessive as to shock the conscience.

Insofar as the appeal of Olga Smith and Paul R. Smith, parents of Paula Smith Daggett, is concerned, we cannot say, as a matter of law, that there is no evidence to support the implied finding of the jury that the deceased Paula Smith Daggett was guilty of contributory negligence.

The judgment is affirmed.

Gibson, C. J., Shenk, J., and Traynor, J., concurred.

SCHAUER, J., Dissenting.—It is my view that it was prejudicial error to bring before the jury the fact that after the accident defendant railroad company reduced its speed limitation from 90 to 50 miles an hour at the intersection in Solano Beach where the railroad tracks crossed Plaza Street and where the accident occurred. The attempt to defend such an error as being merely the presentation of impeaching evidence appears to me to be without support in the record. To the contrary, the record affirmatively shows that at no time did the witness, Benton, testify that the limitation for the crossing remained at 90 miles an hour at the time of trial. His testimony was clearly to the effect that the general limitation for the entire fourth district—i.e., the area from Fullerton to San Diego—was 90 miles both at the time of the accident and at the time of trial, and he had further made clear that there were other limitations calling for lesser speeds at various smaller areas within the district. Moreover, any confusion as to speeds, times, and districts or areas appears from the record to have been invited and brought about by counsel for plaintiffs, who then seized upon such alleged confusion as an excuse to get before the jury otherwise inadmissible evidence of a change in the speed limitation after the accident. The following excerpts from the examination of Benton by counsel for plaintiffs, who had called him as a witness under section 2055 of the Code of Civil Procedure, will so demonstrate (all italics have been added):

"Q. [By counsel for plaintiff] What *was* [at the time of the accident] that crossing posted for as far as the railroad was concerned? A. *90 miles an hour.* . . .

"Q. Now, with reference to whether you were early or late, were you late on that run, on that day? A. We were. We were late. . . .

"Q. And where was the place to the Los Angeles side of Solano Beach where you had last attempted to pick up some time? A. The speed restriction down *at the district* is 90 miles per hour, *with the exception of where there is curve restrictions or restrictions otherwise.* . . .

"Q. Well, how fast *did* you usually go across that intersection in Solano Beach? A. Between 80—between 80 and 90 miles per hour. . . .

"Q. But across this intersection your speed varies [note present tense used by counsel for plaintiff] between 80 and 90 miles an hour; right? A. Yes, sir. . . .

"Q. Could you go as fast as 90 miles an hour around this curve that comes into Solano Beach or *is* [note the present tense] that restricted to less? A. That is 90 miles an hour.

"Q. And do I understand that you could go 90 miles an hour all the way from Los Angeles to San Diego? A. *No,* sir, because *there is restrictions, curve restrictions and other forms of restrictions.*

"Q. How about that curve from Cardiff into the place of the accident; *isn't* [note present tense] that curve restricted to 85? A. That's a 90 mile an hour curve. . . .

"Q. . . . Now, you have driven these diesels similar to the one you were driving on that day for some time, haven't you? A. Yes, sir.

"Q. And in driving those diesels, have you gone over 90 miles an hour with them? . . . A. I have. Those diesels are a hundred-mile-an-hour diesel, but *that* particular *district is 90 mile restriction* down there. *That's known as the fourth district.* . . .

"Q. What does fourth district mean; can you tell us? A. Well, that's the district from one station to the other.

"Q. That has nothing to do with the type of speed, does it? A. No.

"Q. Merely nomenclature of the area, merely geographically a description or appellation of the area, what it is called; is that right? A. What the company, what particular restriction they put on that particular district, why [the reason why] I don't know.

"Q. *Is* [note present tense employed by counsel for plaintiff] that put on the whole district from Los Angeles all the way to San Diego? A. That just runs from Fullerton to San

Diego, but from Los Angeles to Fullerton is a portion of the third district.

"Q. And then you *have* [note present tense] to go slower in that area? A. That's right.

"Q. What speed *do you go* [note present tense] in the area between Fullerton and Los Angeles? . . . A. The speed *restriction on* all *districts* in the Santa Fe Los Angeles Division *is 90 miles* an hour.

"Q. How about between Fullerton and Los Angeles? A. That *is* 90 miles an hour, too.

"Q. So there *is* no more restriction there than there *is* down here? A. Not at this time. I don't recall whether—it was a hundred on all districts but the third and the fourth districts it was less, but it *is* the same all over now, with the exception of the third district. That *is* 80.

"Q. You are not speaking of what it *is* now, are you? A. No. It *is 90 now on the* first, second, and *fourth districts.*

"Q. Well, Mr. Benton, the *restriction now is 50 miles an hour, isn't it?*

"MR. NIELSEN [Counsel for defendants]: I will object to that, your Honor, on the ground that has no materiality in the case.

"THE COURT: I don't know what district you refer to.

"MR. BELLI [Counsel for plaintiffs]: He is referring to the fourth. He says that the restriction *in the fourth district now is 90* miles an hour. *We are prepared to show* that the *restriction* in this district *at this crossing now,* rather than being 90 miles an hour, *is 50* miles an hour.

"MR. NIELSEN: Just a moment, your Honor. Let's take this up outside the presence of the jury. . . . I cite the statement of counsel as misconduct in attempting to bring before the jury a totally immaterial issue.

"THE COURT: Counsel is simply stating his theory of the case, what he expects to prove. Proceed, sir.

"MR. BELLI: Q. Mr. Benton, you say that the speeds *in these areas then* and *now* are 90 miles an hour?

"MR. NIELSEN: I will object to that——

"THE COURT: That is compound. Then and now.

"MR. BELLI: Q. You have told us that the speed *in the area* right *now* is 90 miles an hour.

"MR. KNOWLTON [Counsel for defendants]: Your Honor, I object to that question as being immaterial. The only critical factor there is the speed at the time of this accident.

"THE COURT: I thought—now, if you mean *the entire area from Los Angeles to San Diego*——

"MR. BELLI: *First that and then at Plaza Street.*

"THE COURT: Well, I don't know yet. You say first and then Plaza Street. *I don't know whether you mean there at Solano Beach at the intersection* in question *or whether you mean an entire area between Los Angeles and San Diego. It is vague and indefinite* to me, sir.

"MR. BELLI: May I withdraw that and put it this way, your Honor?

"Q. Mr. Benton, *is it your testimony that the speed* area *at* this *Plaza Street now is 90* miles an hour?

"MR. KNOWLTON: I object to that question, your Honor, on the grounds it is immaterial to any issue in this case.

"THE COURT: Objection overruled. You may answer.

"Q. *The speed now at the Plaza area.* A. *50 miles* an hour.

"MR. BELLI: Q. *It is 50 miles now?* A. *Yes,* sir.

"Q. *Do you know when that was changed to 50* miles an hour?

"MR. KNOWLTON: The same objection, your Honor.

"THE COURT: Objection sustained.

"MR. BELLI: Q. *At the time of the accident, the speed at the Plaza crossing was 90* miles an hour?

"MR. KNOWLTON: Object to that question, your Honor, on the grounds it has been asked and answered four times.

"THE COURT: Objection sustained."

From the above-quoted portion of the record it is apparent that counsel for plaintiffs, by swinging back and forth between past tense and present tense, and by discussing speed restrictions without specific indication of whether he referred to restrictions within entire railroad districts or to restrictions at a smaller area within a district (such as at the Plaza Street crossing here involved), succeeded in confusing not only Benton, the witness, but also the court itself. Counsel then seized upon the confusion which he himself had engendered, to not only bring before the jury the fact that the restriction at the Plaza Street crossing had been changed to 50 miles, but to emphasize that the change had taken place subsequent to the accident. The admission of such improper evidence could not, and did not, tend to impeach the witness, who at no time had testified that the *Plaza Street* intersection speed had remained at 90 miles an hour up to the time of trial; on the contrary, the witness had clearly stated that the overall restriction in the fourth district (i.e., from

Fullerton to San Diego) remained at 90 miles, but he had also several times referred to ''curve restrictions and other forms of restrictions'' within districts—references which were plainly understood by plaintiff's counsel, who himself likewise referred to such lesser restrictions. Inasmuch as the issue of negligence on the part of defendants was close, it appears that the error of admitting such evidence of changed conditions was prejudicial.

As stated in the majority opinion, the jury impliedly found that the deceased mother of the children, who was driving the automobile in which they were riding when they met their death, was guilty of contributory negligence. That automobile was estimated to have been traveling at a speed of from 10 to 15 miles an hour at the Plaza Street intersection when the accident occurred. The accident took place shortly before midday, and the weather was clear. Four disinterested witnesses testified that the automatic wigwag was in operation prior to and at the time of the collision, and that the train was whistling as it approached. The engineer, Benton, testified that the automatic bell on the locomotive had been ringing continuously from Oceanside (some 15 miles north of Solano Beach), and that an emergency brake application was made some 100 feet prior to the point of impact in response to the fireman's warning of the approaching automobile. The speed tape sealed within the locomotive placed its speed at between 85 and 86 miles an hour at the time the emergency brake application was made. Both the engineer and the fireman testified further that the train air horn was blown for the Plaza Street crossing from a point at least 1,000 feet north of the crossing. Further, plaintiff Daggett testified that both he and his deceased wife had become familiar with the crossing prior to the accident, as well as the operation of the trains and protective devices.

In view of the above related evidence, the prejudicial effect of the erroneous admission of testimony concerning the reduction in the speed limitation at the subject crossing following the accident appears clear. I would reverse the judgment in favor of plaintiff John S. Daggett.

Spence, J., and McComb, J., concurred.

The petition of defendants and appellants for a rehearing was denied July 16, 1957. Schauer, J., Spence, J., and McComb, J., were of the opinion that the petition should be granted.